# IMMIGRATION AND NATURALIZATION SERVICE *v.* PHINPATHYA

No. 82–91.   Argued October 3, 1983—Decided January 10, 1984

*Elliott Schulder* argued the cause for petitioner. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Jensen,* and *Deputy Solicitor General Geller.*

*Bert D. Greenberg* argued the cause for respondent. With him on the brief was *Martin Simone.**

---

*\*James J. Orlow* filed a brief for the American Immigration Lawyers Association as *amicus curiae.*

JUSTICE O'CONNOR delivered the opinion of the Court.

In § 244(a)(1) of the Immigration and Nationality Act (Act), 66 Stat. 214, as amended, 8 U. S. C. § 1254(a)(1), Congress provided that the Attorney General in his discretion may suspend deportation and adjust the status of an otherwise deportable alien who (1) "has been physically present in the United States for a continuous period of not less than seven years"; (2) "is a person of good moral character"; and (3) is "a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or to his spouse, parent, or child . . . ." In this case we must decide the meaning of § 244(a)(1)'s "continuous physical presence" requirement.

I

Respondent, a native and citizen of Thailand, first entered the United States as a nonimmigrant student in October 1969. Respondent's husband, also a native and citizen of Thailand, entered the country in August 1968. Respondent and her husband were authorized to remain in the United States until July 1971. However, when their visas expired, they chose to stay without securing permission from the immigration authorities.

In January 1977, petitioner, the Immigration and Naturalization Service (INS),[1] commenced deportation proceedings against respondent and her husband pursuant to § 241(a)(2) of the Act. See 8 U. S. C. § 1251(a)(2). Respondent and her husband conceded deportability and applied for suspension

---

[1] The Attorney General is authorized to delegate his powers under the Act. 8 U. S. C. § 1103. Accordingly, 8 CFR § 2.1 (1983) delegates the Attorney General's power to the Commissioner of Immigration and Naturalization, and permits the Commissioner to redelegate his authority through appropriate regulations. The Commissioner has delegated the power to consider § 244 applications to special inquiry officers, whose decisions are subject to review by the Board of Immigration Appeals (BIA), 8 CFR §§ 242.8, 242.21 (1983).

pursuant to § 244(a)(1). 8 U. S. C. § 1254(a)(1). An Immigration Judge found that respondent's husband had satisfied § 244(a)(1)'s eligibility requirements and suspended his deportation. App. to Pet. for Cert. 29a–31a. But respondent's own testimony showed that she had left the country during January 1974, and that she had improperly obtained a nonimmigrant visa from the United States consular officer in Thailand to aid her reentry three months later.[2] On the basis of this evidence, the Immigration Judge concluded that respondent had failed to meet the 7-year "continuous physical presence" requirement of the Act:

> "[Respondent's] absence was not brief, innocent, or casual. The absence would have been longer than three months if she had not obtained the spouse of a student visa as fast as she did obtain it. It was not casual because she had to obtain a new Tha[i] passport, as well as a nonimmigrant visa from the American Consul, to return to the United States. It was not innocent because she failed to inform the American Consul that she was the wife of a student who had been out of status for three years (and therefore not entitled to the nonimmigrant visa she received)." *Id.*, at 28a.

Accordingly, he denied respondent's application for suspension. *Id.*, at 28a–29a.

The Board of Immigration Appeals (BIA) affirmed the Immigration Judge's decision on the "continuous physical pres-

---

[2] App. 17–24. About one month prior to her departure, respondent obtained a new Thai passport. *Id.*, at 21–22. However, when she departed for Thailand, respondent did not have a nonimmigrant visa allowing her to reenter this country. After her arrival in Thailand, respondent went to the United States Consul and obtained a nonimmigrant visa as the wife of a foreign student. Although respondent was aware that her husband's student visa had expired more than two years earlier, she failed to inform the consular officer of that fact. *Id.*, at 23–24.

ence" issue.[3]  BIA observed that respondent was illegally in the United States at the time she left for Thailand and that she was able to return only by misrepresenting her status as the wife of a foreign student. *Id.*, at 17a–18a.  Based on these observations, BIA concluded that respondent's absence was meaningfully interruptive of her continuous physical presence in the United States. *Ibid.*

The Court of Appeals reversed.  673 F. 2d 1013 (CA9 1981).  It noted that, although respondent traveled to Thailand for three months, "she intended, at all times, to return to the United States." *Id.*, at 1017.  The court held that BIA had placed too much emphasis on respondent's illegal presence prior to her departure and on the increased risk of deportation that her departure had engendered. *Id.*, at 1017–1018.  Finding BIA's approach legally erroneous, it concluded that

> "an absence cannot be 'meaningfully interruptive' if two factors are present: (1) the hardships would be as severe if the absence had not occurred, and (2) there would not be an increase in the risk of deportation as a result of the absence." *Id.*, at 1018, and n. 6 (citing *Kamheangpatiyooth* v. *INS*, 597 F. 2d 1253, 1257 (CA9 1979)).

Since BIA failed "to view the circumstances in their totality, and analyze those circumstances in light of the [underlying] Congressional purpose," 673 F. 2d, at 1017,[4] the court re-

---

[3] BIA reversed the Immigration Judge's decision that respondent's false testimony at her deportation hearing did not bar her from establishing her good moral character.  App. to Pet. for Cert. 18a–19a.  BIA also reversed the Immigration Judge's conclusion that respondent's husband was eligible for suspension of deportation, ruling that he had failed to establish extreme hardship either to himself or his epileptic daughter, *id.*, at 19a–21a.

[4] The "totality of the circumstances" approach was first articulated in *Kamheangpatiyooth,* which reaffirmed the Court of Appeals' earlier ruling in *Wadman* v. *INS,* 329 F. 2d 812 (CA9 1964).  See 597 F. 2d, at 1256. *Wadman* held that the principles established by this Court in *Rosenberg*

manded for further proceedings on the "continuous physical presence" issue.[5]

We granted certiorari, 459 U. S. 965 (1982), to review the meaning of § 244(a)(1)'s requirement that an otherwise deportable alien have been "physically present in the United States for a continuous period of not less than seven years . . . ." 8 U. S. C. § 1254(a)(1). We find that the Court of Appeals' interpretation of this statutory requirement departs from the plain meaning of the Act.[6]

---

v. *Fleuti*, 374 U. S. 449 (1963) (interpreting whether a lawful resident alien had made an "entry" within the meaning of 8 U. S. C. § 1101(a)(13)), should also guide the determination whether an intervening absence interrupts the continuity of physical presence for purposes of § 244(a)(1). 329 F. 2d, at 816. *Kamheangpatiyooth* concluded, however, that the principles enunciated in *Fleuti* were only "evidentiary" on the issue of whether a lawful resident's departure meaningfully interrupts his continuous physical presence under § 244(a)(1). 597 F. 2d, at 1257.

[5] The Court of Appeals also overturned BIA's finding that respondent was not of good moral character, and remanded for reconsideration of that issue. 673 F. 2d, at 1018–1020. In addition, it reversed BIA's finding that respondent's husband had failed to prove that extreme hardship would result from his deportation. *Id.*, at 1016–1017. Petitioner questions both rulings, but did not seek certiorari review of them. See Brief for Petitioner 8, and n. 5. We accordingly express no opinion on these issues.

[6] Respondent contends that the case is moot. Brief for Respondent 1–6. She asserts that since her return from Thailand in April 1974, she has been physically present in the United States for a continuous period of more than seven years. Accordingly, respondent claims that even if the Court were to reverse she could obtain suspension of deportation.

Respondent's mootness argument is without merit. Although respondent has filed a motion with BIA asking that her deportation proceeding be reopened, granting of the motion is entirely within BIA's discretion. See 8 CFR § 3.2 (1983); *INS* v. *Jong Ha Wang*, 450 U. S. 139, 143–144, and n. 5 (1981). Moreover, even if BIA does reopen the proceeding, there is no basis in the present record for concluding that BIA will determine that respondent is eligible for suspension of deportation. Counsel's unsupported assertions in respondent's brief do not establish that respondent could satisfy the "continuous physical presence" requirement. In short, we have no basis for concluding that the case is or will become moot.

## II

This Court has noted on numerous occasions that "in all cases involving statutory construction, 'our starting point must be the language employed by Congress,' . . . and we assume 'that the legislative purpose is expressed by the ordinary meaning of the words used.'" *American Tobacco Co.* v. *Patterson,* 456 U. S. 63, 68 (1982), quoting *Reiter* v. *Sonotone Corp.,* 442 U. S. 330, 337 (1979), and *Richards* v. *United States,* 369 U. S. 1, 9 (1962). The language of § 244(a)(1) requires certain threshold criteria to be met before the Attorney General or his delegates, in their discretion, may suspend proceedings against an otherwise deportable alien. This language plainly narrows the class of aliens who may obtain suspension by requiring each applicant for such extraordinary relief to prove that he

> "has been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application, . . . that during all of such period he was and is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence . . . ." 8 U. S. C. § 1254(a)(1).

The ordinary meaning of these words does not readily admit any "exception[s] to the requirement of seven years of 'continuous physica[l] presence' in the United States to be eligible for suspension of deportation." *McColvin* v. *INS,* 648 F. 2d 935, 937 (CA4 1981).

By contrast, when Congress in the past has intended for a "continuous physical presence" requirement to be flexibly administered, it has provided the authority for doing so. For example, former § 301(b) of the Act, which required two

years of "continuou[s] physica[l] presen[ce]" for maintenance
of status as a United States national or citizen, provided that
"absence from the United States of less than sixty days in the
aggregate during the period for which continuous physical
presence in the United States is required shall not break the
continuity of such physical presence." 86 Stat. 1289, repeal-
ing 71 Stat. 644 (12-month aggregate absence does not break
continuity of physical presence). The deliberate omission of
a similar moderating provision in § 244(a)(1) compels the
conclusion that Congress meant this "continuous physical
presence" requirement to be administered as written.

Indeed, the evolution of the deportation provision itself
shows that Congress knew how to distinguish between actual
"continuous physical presence" and some irreducible mini-
mum of "nonintermittent" presence. Prior to 1940, the At-
torney General had no discretion in ordering deportation, and
an alien's sole remedy was to obtain a private bill from Con-
gress. See *INS* v. *Jong Ha Wang*, 450 U. S. 139, 140, and
n. 1 (1981). In 1940, Congress authorized the Attorney Gen-
eral to suspend deportation of aliens of good moral character
whose deportation "would result in serious economic detri-
ment" to the aliens or their families. See 54 Stat. 672.
Then, in 1948, Congress amended the statute again to make
the suspension process available to aliens who "resided con-
tinuously in the United States for seven years or more" and
who could show good moral character for the preceding five
years, regardless of family ties. 62 Stat. 1206. Finally, in
1952, "in an attempt to discontinue lax practices and dis-
courage abuses," Congress replaced the 7-year "continuous
residence" requirement with the current 7-year "continuous
physical presence" requirement. H. R. Rep. No. 1365, 82d
Cong., 2d Sess., 31 (1952). It made the criteria for suspen-
sion of deportation more stringent both to restrict the oppor-
tunity for discretionary action, see *ibid.*, and to exclude

"aliens [who] are deliberately flouting our immigration
laws by the processes of gaining admission into the

United States illegally or ostensibly as nonimmigrants but with the intention of establishing themselves in a situation in which they may subsequently have access to some administrative remedy to adjust their status to that of permanent residents." S. Rep. No. 1137, 82d Cong., 2d Sess., pt. 1, p. 25 (1952).[7]

Had Congress been concerned only with "nonintermittent" presence or with the mere maintenance of a domicile or general abode, it could have retained the "continuous residence" requirement. Instead, Congress expressly opted for the 7-year "continuous physical presence" requirement.

The statutory switch from "continuous residence" to "continuous physical presence" was no simple accident of draftsmanship. Congress broadened the class of aliens eligible for admission to citizenship by requiring only five years' "continuous residence" and "physical presence" for at least half the period of residency. Concomitantly, it made § 244(a)(1) more restrictive; suspensions of deportations are "grossly unfair to aliens who await abroad their turn on quota waiting lists,"[8] and Congress wanted to limit the number of aliens allowed to remain through discretionary action.[9] The citi-

---

[7] See also S. Rep. No. 1515, 81st Cong., 2d Sess., 602 (1950) (criticism of the administrative interpretation of the 7-year residence provision).

[8] H. R. Rep. No. 1365, 82d Cong., 2d Sess., 63 (1952).

[9] The 1952 Act also required an alien to show "exceptional and extremely unusual hardship" to qualify for suspension of deportation. 66 Stat. 214. In 1962, Congress amended § 244(a)(1) to require that the alien show deportation would result in "extreme hardship." 76 Stat. 1248. It retained the literal "continuous physical presence" requirement word-for-word, although it added an express exception in § 244(b) for aliens who had served at least 24 months' active service in the Armed Forces.

JUSTICE BRENNAN cites various statements, especially those of Senator Keating, in the legislative history of the 1962 amendments to support his belief that the Act should not be literally interpreted. See *post*, at 199–205. These statements, of course, relate not to the "continuous physical presence" requirement, which Congress retained as a strict condition precedent to deportation suspension, but to the "extreme hardship" requirement. As Senator Keating himself explained: "Section 244 as amended would

zenship and suspension-of-deportation provisions are inter-related parts of Congress' comprehensive scheme for admitting aliens into this country. We do justice to this scheme only by applying the "plain meaning of [§ 244(a)(1)], however severe the consequences." *Jay* v. *Boyd,* 351 U. S. 345, 357 (1956). The Court of Appeals' inquiry into whether the hardship to be suffered upon deportation has been diminished by the alien's absence fails to do so.

## III

Respondent contends that we should approve the Court of Appeals' "generous" and "liberal" construction of the "continuous physical presence" requirement notwithstanding the statute's plain language and history. Brief for Respondent 10 (quoting *Kamheangpatiyooth* v. *INS,* 597 F. 2d, at 1256, and n. 3). She argues that the Court of Appeals' construction is in keeping both with our decision in *Rosenberg* v. *Fleuti,* 374 U. S. 449 (1963), and with the equitable and ameliorative nature of the suspension remedy. We disagree.

## A

In *Fleuti,* this Court held that a lawful permanent resident alien's return to the United States after an afternoon trip to Mexico did not constitute an "entry" within the meaning of § 101(a)(13) of the Act.[10] We construed the term "intended"

---

permit aliens who have been physically present in the United States for 7 years, or, in more serious cases, for 10 years, to apply to the Attorney General for a suspension of deportation as under present section 244. The alien would have to show a specified degree of hardship . . . . The conference version of section 244 . . . has continuing future applicability to any alien who can satisfy either the 7- or the 10-year physical presence requirement in addition to the other criteria for suspension of deportation." 108 Cong. Rec. 23448–23449 (1962).

[10] 8 U. S. C. § 1101(a)(13). That provision defines an "entry" as "any coming of an alien into the United States . . . except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his

in the statutory exception to the definition of "entry" to mean an "intent to depart in a manner which can be regarded as meaningfully interruptive of the alien's permanent residence." *Id.*, at 462. We interpreted the statute not to allow a lawful resident alien like Fleuti to be excluded "for a condition for which he could not have been deported had he remained in the country," *id.*, at 460, because it would subject the alien to "unsuspected risks and unintended consequences of . . . wholly innocent action." *Id.*, at 462. Since Fleuti had gone to Mexico, without travel documents, for only a few hours, we remanded for a determination whether his departure had been "innocent, casual, and brief," and so not "meaningfully interruptive" of his permanent residence. *Id.*, at 461, 462.

*Fleuti* is essentially irrelevant to the adjudication of respondent's § 244(a)(1) suspension application. *Fleuti* dealt with a statutory exception enacted precisely to ameliorate the harsh effects of prior judicial construction of the "entry" doctrine. See *id.*, at 457–462. By contrast, this case deals with a threshold requirement added to the statute specifically to limit the discretionary availability of the suspension remedy. See *supra*, at 190–191. Thus, whereas a flexible approach to statutory construction was consistent with the congressional purpose underlying § 101(a)(13), such an approach would not be consistent with the congressional purpose underlying the "continuous physical presence" requirement. *Ibid.*

In *Fleuti*, the Court believed that Congress had not considered the "meaningless and irrational hazards" that a strict application of the "entry" provision could create. Thus, it inferred that Congress would not have approved of the other-

---

departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him . . . ."

The question of an "entry" may properly be determined in an exclusion, as well as a deportation, hearing. See *Landon* v. *Plasencia*, 459 U. S. 21 (1982).

wise harsh consequences that would have resulted to Fleuti. See 374 U. S., at 460–462. Here, by contrast, we have every reason to believe that Congress considered the harsh consequences of its actions. Congress expressly provided a mechanism for factoring "extreme hardship" into suspension of deportation decisions. We would have to ignore the clear congressional mandate and the plain meaning of the statute to find that *Fleuti* is applicable to the determination whether an otherwise deportable alien has been "physically present in the United States for a continuous period of not less than seven years . . . ." 8 U. S. C. § 1254(a)(1).[11] We refuse to do so.

We also note, though it is not essential to our decision, that *Fleuti* involved the departure of a *lawful* resident alien who, but for his departure, otherwise had a statutory right to remain in this country. This case, by contrast, deals with the departure of an *unlawful* alien who could have been deported even had she remained in this country. Such an alien has no basis for expecting the Government to permit her to remain in the United States or to readmit her upon her return from foreign soil. Thus, respondent simply is not being excluded "for a condition for which [she] could not have been deported had [she] remained in the country . . . ." 374 U. S., at 460.[12]

---

[11] In *INS* v. *Jong Ha Wang*, this Court observed that a narrow interpretation of the term "extreme hardship" was "consistent with the 'extreme hardship' language, which itself indicates the exceptional nature of the suspension remedy." 450 U. S., at 145. Similarly, we find only the plain meaning of the "continuous physical presence" requirement to be consistent with the exceptional nature of the suspension remedy.

[12] The other Courts of Appeals, even though uncertain about *Fleuti*'s application to § 244(a)(1), have routinely rejected suspension of deportation applications of unlawful aliens who literally have not been physically present in the United States for a continuous period of seven years. See, e. g., *Fidalgo/Velez* v. *INS*, 697 F. 2d 1026 (CA11 1983); *McColvin* v. *INS*, 648 F. 2d 935 (CA4 1981); *Heitland* v. *INS*, 551 F. 2d 495 (CA2), cert. denied, 434 U. S. 819 (1977).

## B

Respondent further suggests that we approve the Court of Appeals' articulation of the "continuous physical presence" standard—that an absence is "meaningfully interruptive" only when it increases the risk and reduces the hardship of deportation—as consistent with the ameliorative purpose of, and the discretion of the Attorney General to grant, the suspension remedy. Brief for Respondent 6–11. Respondent's suggestion is without merit.

Although § 244(a)(1) serves a remedial purpose, the liberal interpretation respondent suggests would collapse § 244 (a)(1)'s "continuous physical presence" requirement into its "extreme hardship" requirement and read the former out of the Act. The language and history of that section suggest that "continuous physical presence" and "extreme hardship" are separate preconditions for a suspension of deportation. See n. 9, *supra*. It strains the statutory language to construe the "continuous physical presence" requirement as requiring yet a further assessment of hardship.

It is also clear that Congress intended strict threshold criteria to be met before the Attorney General could exercise his discretion to suspend deportation proceedings. Congress drafted § 244(a)(1)'s provisions specifically to restrict the opportunity for discretionary administrative action. Respondent's suggestion that we construe the Act to broaden the Attorney General's discretion is fundamentally inconsistent with this intent. In *INS* v. *Jong Ha Wang*, we rejected a relaxed standard for evaluating the "extreme hardship" requirement as impermissibly shifting discretionary authority from INS to the courts. 450 U. S., at 146. Respondent's suggestion that we construe the Act to broaden the Attorney General's discretion analogously would shift authority to relax the "continuous physical presence" requirement from Congress to INS and, eventually, as is evident from the experience in this case, to the courts. We must therefore

reject respondent's suggestion as impermissible in our tripartite scheme of government.[13]   Congress designs the immigration laws, and it is up to Congress to temper the laws' rigidity if it so desires.

## IV

The Court of Appeals' approach ignores the plain meaning of § 244(a)(1) and extends eligibility to aliens whom Congress clearly did not intend to be eligible for suspension of deportation.   Congress meant what it said: otherwise deportable aliens must show that they have been physically present in the United States for a continuous period of seven years before they are eligible for suspension of deportation.   The judgment of the Court of Appeals therefore is

*Reversed.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE STEVENS join, concurring in the judgment.

The Court today holds that an unexplained 3-month absence from the United States disqualifies an alien from eligibility for relief from deportation under § 244(a)(1) of the Immigration and Nationality Act (Act), 8 U. S. C. § 1254(a)(1), *ante*, this page, and further, that our decision in *Rosenberg* v. *Fleuti*, 374 U. S. 449 (1963), is essentially irrelevant in the § 244(a)(1) context, *ante*, at 192–194.   I agree with both of these conclusions.   In the process of reaching them, however, the Court seems to imply that Congress intended the term "con-

---

[13] The Solicitor General admits that prior to "the Ninth Circuit's decision in 1964 in *Wadman* v. *INS*, 329 F. 2d 812, the lower courts and the Board of Immigration Appeals generally applied a strict, literal interpretation of the 'continuous physical presence' language in Section 244(a)(1) and held ineligible for suspension of deportation any alien who was absent from the United States during the seven year period, without regard to the circumstances surrounding the absence."   Brief for Petitioner 11–12 (citing cases).   Our decision today frees INS from the strictures of *Wadman* and interprets the language as Congress has written it.   Contrary to JUSTICE BRENNAN's suggestion, see *post*, at 197, neither we nor INS have authority to create " 'room for flexibility in applying' " § 244(a)(1) when the language chosen by Congress and its purpose are otherwise.

tinuous" in the phrase "physically present . . . for a continuous period" to be interpreted literally, *ante*, at 189, 195–196. If that is what the Court implies, the status of temporary absences far different from the one at issue in this case—for example, a short vacation in Mexico, see *Wadman* v. *INS*, 329 F. 2d 812 (CA9 1964), an inadvertent train ride through Canada while en route from Buffalo to Detroit, see *Di Pasquale* v. *Karnuth*, 158 F. 2d 878 (CA2 1947), a trip to one's native country to tend to an ailing parent, or some other type of temporary absence that has no meaningful bearing on the attachment or commitment an alien has to this country—would presumably be treated no differently from the absence at issue today. Because such absences need not be addressed to decide this case, and, in any event, because I believe that Congress did not intend the continuous-physical-presence requirement to be read literally, I part company with the Court insofar as a contrary interpretation may be implied.

## I

In this case, the Immigration and Naturalization Service (INS) argues that the Court of Appeals has taken too liberal a view of the continuous-physical-presence requirement. It does not argue, however, that the requirement should be interpreted literally; nor does it brief the question whether literally continuous, physical presence should be a prerequisite to suspension of deportation. Indeed, at oral argument, counsel for the INS stated that "the [INS] believes that there is room for flexibility in applying [§ 244(a)(1)]." Tr. of Oral Arg. 8.[1] In light of this express position of the INS, the agency charged with responsibility for administering the immigration laws, as well as the fact that respondent's unexplained 3-month absence from the United States plainly dis-

---

[1] Since at least 1967, the INS has interpreted the continuous-physical-presence requirement flexibly. *Matter of Wong*, 12 I. & N. Dec. 271 (1967). Prior to 1967, the INS had purported to adopt a literal interpretation but had declined to apply that interpretation consistently. See n. 3, *infra*.

qualifies her for relief under any reasonable interpretation of § 244(a)(1), I would not address, by implication or otherwise, the question whether the continuous-physical-presence requirement was meant to be interpreted literally.

## II

Moreover, if we are to understand that the Court implicitly approves of a literal interpretation of the statute, the error of its analysis is patent. It is a hornbook proposition that "[a]ll laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language, which would avoid results of this character. The reason of the law in such cases should prevail over its letter." *United States* v. *Kirby*, 7 Wall. 482, 486–487 (1869). See also *Helvering* v. *Hammel*, 311 U. S. 504, 510 (1941); *United States* v. *Katz*, 271 U. S. 354, 362 (1926). In a case such as this, in which a literal interpretation of a statutory provision may indeed lead to absurd consequences, *supra*, at 197, we must look beyond the terms of the provision to the underlying congressional intent. And in this case, the legislative history of § 244, far from compelling a wooden interpretation of the statutory language, in fact indicates that Congress intended the continuous-physical-presence requirement to be interpreted flexibly.

The Court suggests a contrary conclusion based on two factors: First, the fact that Congress enacted the continuous-physical-presence requirement in 1952 in response to abuses of the more lenient "residence" requirement, which had been in effect since 1948; and second, the fact that former § 301(b) of the Act, which imposed a 2-year continuous-physical-presence requirement upon foreign-born citizens seeking to avoid the loss of their citizenship, explicitly provided that "absence from the United States of less than sixty days . . . shall not break the continuity of such physical presence." *Ante*, at 189–191. But plainly, neither of these aspects of the Act's legis-

lative history sheds meaningful light on the issue of whether the term "continuous" should be interpreted literally. It is true, of course, that Congress replaced the "residence" requirement with the continuous-physical-presence requirement in order to prevent abuses, as the Court states, *ante*, at 190–191, but the abuses identified by Congress are hardly in the nature of a vacation in Mexico, a train ride through Canada, or other similar absences that would defeat eligibility for relief under a literal reading of § 244(a)(1). Instead, Congress sought to prevent much more substantial abuses, such as a situation described in the Senate Report on the Act, in which an alien "has a total of 7 years' residence in the United States [but] the alien has been out of the United States for as long as 2 years during the last 7 years." S. Rep. No. 1515, 81st Cong., 2d Sess., 602 (1950). Furthermore, although it is true that the 60-day leeway allowed under § 301(b) for foreign-born citizens has no counterpart in § 244(a)(1), this only indicates that Congress was unwilling to provide such generous and unrestricted leeway to aliens seeking suspension of deportation. It surely does not indicate that Congress intended *every* type of absence—however innocent or brief—to defeat an alien's eligibility for relief. Finally, as the Court implicitly acknowledges, there is no direct statement in the legislative history of the 1952 Act to indicate that Congress intended to have the term "continuous" interpreted literally. It follows, then, that there is simply no support for giving § 244(a)(1) a literal interpretation.

Indeed, there is direct support for precisely the opposite conclusion in the legislative history of the 1962 amendments to the Act, in which Congress rewrote § 244. The current version of § 244, which barely resembles the original 1952 provision but which retains the continuous-physical-presence requirement, was enacted as part of those amendments.[2] It

---

[2] Major commentators in this field have referred to the 1962 amendments as a "drasti[c] revis[ion]" of § 244. 2 C. Gordon & H. Rosenfield, Immigration Law and Procedure § 7.9a (1983).

is the congressional intent underlying the 1962 amendments, therefore, that is central to the question whether Congress meant to have the continuous-physical-presence requirement applied literally. And the legislative history of those amendments, whether viewed as reflecting the 1952 congressional understanding of the continuous-physical-presence requirement, or as establishing a new understanding in the 1962 revision, reveals an express congressional intent to have the term "continuous" interpreted more flexibly than a literal definition of the term would imply. Moreover, prior to the 1962 amendments, the only Court of Appeals that had occasion to interpret the continuous-physical-presence requirement held that the term "continuous" was not intended to be interpreted literally. *McLeod* v. *Peterson*, 283 F. 2d 180 (CA3 1960). In that case, the court reversed a decision of the INS, holding that an 8-month absence from the United States "does not interrupt the continuity of . . . presence in the United States within the meaning of [§ 244]," under circumstances in which the INS had induced the alien to leave the country without the authority to do so. *Id.*, at 187. In explaining its decision, the court stated that § 244 had "sufficient flexibility to permit a rational effecting of the congressional intent." *Ibid.* Of course, when Congress enacts a new law that incorporates language of a pre-existing law, Congress may be presumed to have knowledge of prior judicial interpretations of the language and to have adopted that interpretation for purposes of the new law. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U. S. 353, 382, n. 66 (1982); *Lorillard* v. *Pons*, 434 U. S. 575, 580–581 (1978). Therefore, even in the absence of explicit indications of legislative intent, we would be justified in concluding that Congress intended to have the continuous-physical-presence requirement interpreted flexibly.[3]

---

[3] Prior to the 1962 amendments, the INS generally purported to interpret the continuous-physical-presence requirement literally, but on at least one occasion, the agency expressly declined to follow through with the lit-

In any event, there are explicit indications in the legislative history of the 1962 amendments that Congress did not intend to enact a literal continuous-physical-presence requirement. The 1962 amendments originated as S. 3361. As introduced, the bill contained a provision that would have amended § 249 of the Immigration and Nationality Act. Section 249, which originated in 1929, allows the Attorney General to confer permanent-residence status upon an alien who meets certain qualifications, such as "good moral character," and establishes that he or she has *resided* in the United States since a statutorily provided date. S. 3361, 87th Cong., 2d Sess., § 4 (1962). At the time of the 1962 amendments, the operative date was June 28, 1940, and S. 3361, as introduced, would have moved that date up to December 24, 1952. Under the Senate bill, therefore, relief from deportation would have been available to an alien who simply established "residence" since 1952, without regard to whether his or her physical presence in this country was literally continuous. The House, however, declined to amend § 249. Instead, the House sent to the Conference Committee a bill that differed from the Senate bill in that it left June 28, 1940, as the operative date of entry for relief under that section. 108 Cong. Rec. 22608–22609 (1962). The Conference Committee, however, compromised between the House and Senate versions of the bill by adopting an amendment to § 244, instead of an amendment to § 249. And it is that compromise that became the current version of § 244.[4]

Basically, the new § 244 differed from the 1952 version in two respects. First, it compressed a complicated system, in which eligible aliens had to meet one of five different sets

---

eral approach. *Matter of J—— M—— D——*, 7 I. & N. Dec. 105 (1956). In explanation, the INS stated that "a statute should be construed so as to carry out the intent of the legislature, although such construction may seem contrary to the letter of the statute." *Id.*, at 107.

[4] The June 28, 1940, date was left unchanged by the Conference Committee bill.

of requirements for relief, depending on the cause of their deportability, into a simple two-category system based essentially on the severity of the reason giving rise to deportability. For example, under the 1962 provision, aliens who are deportable for less severe offenses have to meet a 7-year continuous-physical-presence requirement, see 8 U. S. C. § 1254(a)(1), and those who are deportable for more severe offenses have to meet a 10-year continuous-physical-presence requirement. See § 1254(a)(2). Second, the new § 244 modified the hardship requirement for aliens who committed less severe offenses from one of "exceptional and extremely unusual hardship" to one of "extreme hardship."

In explaining the intent of the conferees, the Conference Report stated that "[t]he now proposed language is designed to achieve the purpose envisaged by the Senate in a modified manner." H. R. Conf. Rep. No. 2552, 87th Cong., 2d Sess., 4 (1962).[5] That is to say, § 244, as revised, was intended to extend relief from deportation to aliens residing in the United States since 1952, at the earliest. The Report then went on to explain that by revising § 244, rather than § 249, this liberalization of relief would be constrained by two factors that were already built into the first, but not the second, provision. Those factors were, first, a requirement that the Attorney General find that deportation would result in personal hardship before granting relief, and, second, a requirement that all grants of relief be subject to congressional review.

When the Conference Committee's compromise was reported on the House floor, one manager stated that "we largely restore title 3 of the Smith Act of 1940 . . . as the guide for the purpose of making a determination of eligibility and obtaining the approval of the Congress for the ruling of the Attorney General," 108 Cong. Rec. 23421 (1962) (statement of Rep. Walter), and another simply restated the Con-

---

[5] Accord, 2 C. Gordon & H. Rosenfield, *supra* n. 2.

ference Report's emphasis on the congressional-review and personal-hardship provisions of the Conference bill, *id.*, at 23423 (statement of Rep. Feighan). The reference to the Smith Act, formally titled the Alien Registration Act of 1940, is particularly significant because that statute, which contained the original suspension-of-deportation remedy, did not impose a continuous-physical-presence requirement. 54 Stat. 672.[6] Under the Smith Act, residence in the United States provided a sufficient basis for the Attorney General to grant suspension of deportation. It is difficult to see, therefore, how this history suggests that the House intended to impose a literal continuous-physical-presence requirement.

Similarly, various statements made by Senators debating the Conference Committee's version of the bill belie the presence of any intent to impose a strict continuous-physical-presence requirement as a prerequisite to relief. For instance, one of the managers of the bill on the Senate floor, Senator Keating, stated that "[n]o person who would have been eligible for administrative relief under section 249 as the Senate proposed and amended it, would be excluded from consideration for relief under section 244 as the conference report now proposes to amend it." 108 Cong. Rec. 23448 (1962). As pointed out above, under the Senate's original proposal, § 249 would have covered aliens who *resided* in the United States since December 24, 1952, regardless of whether their residence amounted to a "continuous physical presence." Senator Keating, therefore, was clearly stating that such aliens would be eligible for suspension of deportation under § 244 as rewritten by the Conference Committee, even though some of them undoubtedly had left the country temporarily during their period of residency here. Accord-

---

[6] Actually, it was Title 2, not Title 3, of that Act that authorized the suspension of deportation. Title 3 had nothing to do with relief from deportation of any kind. I must assume, therefore, that the reference to "Title 3" was a misstatement.

ingly, unless we are willing to decide that the explanation of the statute provided by one of its principal sponsors was, for some reason, flatly wrong, we cannot conclude that the continuous-physical-presence requirement, as enacted in 1962, was intended to be interpreted literally.[7]

To be sure, we gain only limited insight into congressional intent from statements made during floor debate and from conference reports, but we have always relied heavily upon authoritative statements by proponents of bills in our search for the meaning of legislation. *Lewis* v. *United States*, 445 U. S. 55, 63 (1980); *FEA* v. *Algonquin SNG, Inc.*, 426 U. S. 548, 564 (1976). Of necessity, this is particularly true where, as here, a provision was introduced into a bill by a conference committee. The remarks of Senator Keating and the House managers, therefore, plainly illuminate Congress' intent to achieve largely what an updating of § 249 would have achieved, except that the Attorney General was to be constrained by a personal-hardship requirement and congressional review.

It seems inescapable, therefore, that Congress did not intend to have the continuous-physical-presence requirement interpreted literally. Instead, under a proper construction of § 244(a)(1), the INS should remain free to apply the requirement flexibly, unconstrained by any limitation *Rosenberg* v.

---

[7] In light of the language that Congress enacted in 1962 and the historical development of that language, see *ante*, at 190–191, we would have to conclude that Senator Keating's rhetoric was somewhat inaccurate to the extent that it implies that continuous physical presence means residence. This inaccuracy, however, does not detract from the basic point that Congress was not thinking in literal terms when it enacted § 244. If Congress did intend the term "continuous" to be interpreted literally, surely Senator Keating would not have been able to make the statement he made in support of the bill, at least not without some rejoinder.

In support of its interpretation, the Court inexplicably points to another sentence of Senator Keating's remarks in which he used the term "physically present." *Ante*, at 191–192, n. 9. In that statement, the Senator did not, of course, define the meaning of those words—the issue in this case—or even employ the entire phrase with which we are concerned.

*Fleuti*, 374 U. S. 449 (1963), may have imposed. Indeed, in substance, this interpretation conforms with the position of the INS since at least 1967, see *Matter of Wong*, 12 I. & N. Dec. 271 (1967), and is apparently the position to which the agency continues to adhere. See *supra*, at 197, and n. 1.

## III

Because the Court's opinion seems to interpret the Immigration and Nationality Act in a way that is not briefed by the parties, is unnecessary to decide this case, is contrary to the view of the agency with principal responsibility for administering the Act, is unsupported by the statute's legislative history, and would certainly produce unreasonable results never envisioned by Congress, I cannot join the Court's opinion, but concur only in the judgment.