YONG KYO O, Petitioner,
v.
AVIATA FA'ALEVAO, CHAIRMAN IMMIGRATION BOARD OF AMERICAN SAMOA
and ATTORNEY GENERAL OF AMERICAN SAMOA, and
IMMIGRATION BOARD OF AMERICAN SAMOA, Respondents.

High Court of American Samoa
Appellate Division

AP No. 23-83

February 23, 1984

Before GARDNER, Chief Justice, Presiding, MURPHY, Associate Justice, TAUANU'U, Chief Associate Judge and FAOA, Associate Judge.

Counsel: For the petitioner, Roy J.D. Hall, Jr.
For the respondents, Attorney General

GARDNER, C.J.

Winston Churchill once said that golf was a game in which one attempted to put a small ball into a small hole using "woefully inadequate tools." In the immigration law of this territory the Fono has given the attorney general a woefully inadequate tool to carry out his duties.

THE FACTS

Mr. O, a citizen of Korea, has been in this territory over ten years on successive two-year employment contracts, in each of which he agreed to return to Korea upon completion of that contract. In each case the contract was renegotiated prior to its termination. He has applied for permanent resident status and been rejected. This appeal followed.

THE PROBLEM

Of all the departments of the American Samoa Government, that branch of the attorney general's office devoted to enforcement of the immigration laws is at once the most important and the most controversial.

As we have pointed out in previous decisions, this is a small territory. Its economy, its ecology and its environment are fragile. Space and resources are limited; obviously its capacity to absorb population is limited. Yet its population is geometrically expanding. In 1908 the population was about 6,800. In 1959 it was about 20,000. It is now estimated at approximately 33,000. Statistical Tables, Atlas of American Samoa 1981. It seems manifest that a high birth rate and a constant influx of immigrants from Western Samoa are the principal cause of the expansion. The growth would be more spectacular except for a constant departure of young American Samoans seeking employment opportunities in the United States.

17

American Samoans are, of couse, Samoan Polynesians. A noticeable percentage have American, European (chiefly German), Chinese and Japanese ancestors.

Western Samoa is 83 miles away. It has a population of nearly 200,000. It is a much less economically endowed country. A number of Western Samoans have immigrated to New Zealand, the United States and, as previously stated, to American Samoa. American and Western Samoans share a common cultural and racial background. Many families are interrelated. It is clear that the major immigration pressure will continue to come from Western Samoans. (This will be particularly true if the Simpson-Mazzoli or some similar act of Congress naturalizes the Western Samoans in the United States.) People immigrate here from the United States mainland. It seems highly questionable that this territory could exclude any United States citizen, especially one of Samoan ancestry. In addition to the above there are Tongans, Koreans and others living and working in the territory as well as a handful of American expatriates.

While no one seems to know with any degree of certainty it seems that native born American Samoans may already be a minority group in their own territory. It is generally agreed that of a total population of 33,000, only 30,000 are Samoans. Of these it is said that one half are Western Samoans. The rest are, as indicated, a mixed bag of Asians, Tongans and whites.

It is the task of the attorney general to control this unwieldy mass and to address the problems that lay ahead, using as we have said the woefully inadequate and constitutionally suspect (See Ki v. Immigration Board (1983) 1 A.S.R.2d 99.) immigration law. The question of who qualifies as a permanent resident then becomes of vital importance.

## THE LAW

That phase of the immigration law with which we are here concerned is A.S.C.A. section 41.0603(2), which provides that one who has continuously resided in American Samoa for ten years may apply for permanent resident status. Petitioner contends that since he has continuously resided in American Samoa for ten years he is entitled to permanent resident status. Under the statute as written he is. We doubt that was the legislative intent but as Justice Holmes was wont to say, it isn't what the legislature intended that counts, it is what it said.

Commonly understood, reside means to live, dwell, sojourn, lodge or stay someplace. Webster's Third International Dictionary. Petitioner has continuously resided in the territory for ten years. Under this law as written he qualifies for permanent resident status.

But how about someone who enters the territory illegally and hides out from the authorities for ten years or spends his ten years engaged in a life of crime. Can he qualify for permanent resident status? Unfortunately, under the law as now written, he can. To avoid this, the attorney general has, by executive fiat, unilaterally amended the law to provide that one must be in the territory legally to attain permanent resident status. This is a worthwhile and commendable qualification but not one appearing in the law as written.

By a stroke of the legislative pen the Fono can amend this law, end the attorney general's dilemma and give him a viable weapon to use in evaluating and controlling those seeking permanent resident status. The United States Immigration Law, 8 U.S.C. sec. 1254, provides in substance that the attorney general may adjust the status of an otherwise deportable alien who has (1)

18

been physically present in the United States for a continuous period of not less than seven years, (2) is a person of good moral character and (3) is a person whose deportation would cause a hardship.

The use of the phrase "continuous physical presence" is not a legislative accident. The prior law used the phrase "continuous residence." Problems arising from the use of the word "residence" had resulted in "lax practices" and "abuses." Immigration & Naturalization Service v. Phinpathya (1984) ___ U.S. ___, 52 U.S.L.W. 4027. This was because the word "residence" has often become, in contemplation of law, a word of art, synonymous with the word "domicile," which has a mixed connotation of fact and intent. Thus, one can physically reside in one place but keep his "residence" or "domicile" in another. Military service is the most common example. "Continuous physical presence" brooks no hair-splitting ambiguity.

To avoid the plain language of this statute (A.S.C.A. sec. 41.0603(2) the attorney general now contends that Mr. O cannot gain permanent resident status because of A.S.C.A. section 41.0605, which provides that when one loses the status on which entry or stay was based (in this case Mr. O's employment status), he is deemed a person entering from that date.

There are four factors that militate against that contention. First, Mr. O's employment contracts were renegotiated before termination. Second, this smacks of intentional discriminatory enforcement of the law since at least one other alien received permanent resdient status under identical successive contract conditions. Third, just before these proceedings the attorney general signed a document entitled, "Certificate of eligibility for permanent resident status" in which he stated that Mr. O had resided continuously in the territory for more than ten years and "is eligible under the law for permanent residency status." Fourth, this seems to be a last gasp effort to avoid the inevitable. Nowhere in the immigration board decision or in the appellee's brief was section 41.0605 mentioned. It first surfaced at the evidenciary hearing.

Reliance cannot be had on A.S.C.A section 41.0605.

It appears to us that a wholesale revision of the immigration law is in order. The Fono is going to have to make some tough decisions. Should they impose a quota on aliens and if so, on what aliens? Should there even be a continuous physical presence provision? Why? What is to be done about Western Samoans who by reason of the extended family concept are actually a part of American Samoan families? Are Western Samoans to be treated in a different manner than other aliens? Are there inequities and abuses in the present sponsorship program? What is the effect of the American Samoan citizen concept as contained in the proposed revisions to the American Samoan Constitution? What is the status of non-Polynesians, or part Polynesians, who are United States citizens? And, in a broad sense, what are immigration problems of the territory, their size and complexity? The whole field cries for Fono action. We have made this suggestion before—all to no avail. See Ki v. Immigration Board (1983) 1 A.S.R.2d 99.

THE ATTORNEY GENERAL

The present statutory scheme places the attorney general in an indefensible position—policeman, prosecutor and judge.

The United States Supreme Court, recognizing the complexity and prevalence of administrative tribunals exercising quasi-judicial powers, has not seen fit to rule that in all cases the investigating agency may not also be the judging agency. Nevertheless, in Withrow v. Larkin (1975) 421 U.S. 35, 43 L. Ed. 2d 712, the Court warned against situations in which the risk of

19

unfairness is "intolerably high."

It is an integral part of the American judicial system of justice that an impartial magistrate or judge be interposed between a zealous police officer or prosecutor and the individual. Failure to do so constitutes a denial of due process of law guaranteed by both the United States Constitution and the Constitution of American Samoa. Further, as the Winthrow Court said at page 15, "Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.'" See also Gibson v. Berryhill (1973) 411 U.S. 564, 36 L. Ed. 2d 488; Ward v. Village of Monroeville (1972) 409 U.S. 57, 34 L. Ed. 2d 267; Tumey v. Ohio (1927) 273 U.S. 510.

As constituted at present, does the position of the attorney general as chairman of the immigration board raise the risk of unfairness to an 'intolerably high" level? We hold it does. In the average case the attorney general arrests the alien, prosecutes him and judges him. Even when, as in this case, there is no charge of an immigration violation and the board sits merely to determine status, the same aura of lack of impartiality exists.

While we cannot change the law, we must, consistent with our constitutional mandate, insist that due process be observed. Thus, we hold that in this case Mr. O's constitutional right to due process was violated when the attorney general sat as a member of the immigration board. We suggest that hereafter, pending Fono action, he disqualify himself from sitting on that board.

Again, the federal practice is informative. Under 8 U.S.C. section 1103(a) the responsibility for enforcement of immigration and naturalization laws is vested in the attorney general. Nevertheless, with a realization that the attorney general will be prosecuting those charged with violations of those laws the office of the Commissioner of Immigration and Naturalization (a presidential appointee) is established (8 U.S.C. sec.1103(b))'. That commissioner has delegated special hearing officers to hear these matters. These rulings are subject to review by the Board of Immigration Appeals (8 C.F.R. secs. 282.8 & 242.21). Thus, while the attorney general has over-all responsibility for enforcement of the immigration and naturalization laws, others handle the judging function.

The Fono has removed the attorney general from the tax exemption board in a recent amendment to A.S.C.A. section 11.1603, advising in the reviser's comments that the attorney general's membership on boards and commissions raised potential conflicts of interest, particularly when the board or commission is conducting adjudicatory hearings and the government is represented by legal counsel. "Further, it curtails his role as legal advisor to these boards and commissions. Accordingly, this legislation is intended to eliminate these problems in the future."

The Fono should do the same with the immigration board.


MR. O


At long last we return to Mr. O.

While in complete sympathy with the attorney general's efforts to apply a sensible interpretation to this unworkable law, we must rule that anyone who has resided continuously in the territory for ten years is entitled to permanent resident status. Mr. O qualifies. Further, Mr. O was denied due process of law because the attorney general sat on the immigration board. Therefore, we order the immigration board to issue him a certificate of permanent resident status.