Herman **SALDANA**, Petitioner,

v.

**IMMIGRATION AND NATURALIZA-TION SERVICE**, Respondent.

Nos. 84–7118, 84–7549.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 5, 1985.

Decided June 10, 1985.

Heriberto Gonzales, Los Angeles, Cal., for petitioner.

Dzintra Janavs, Los Angeles, Cal., for respondent.

Before GOODWIN, FLETCHER, and PREGERSON, Circuit Judges.

PREGERSON, Circuit Judge.

Petitioner, Herman Saldana, appeals the decisions of the Board of Immigration Appeals (BIA) denying his motions to reopen his deportation proceeding and to reconsider his prior motion to reopen immigration proceedings to permit him to apply for suspension of deportation. For the reasons stated below, we reverse and remand for further proceedings.

FACTS

Petitioner, a native and citizen of Peru, entered the United States in March, 1971 as a nonimmigrant visitor. The Immigration and Naturalization Service (INS) subsequently changed Saldana's status to that of a student and authorized him to enroll at California State University at Los Angeles where he eventually earned a B.A. degree in Political Science. Saldana failed to maintain his student status when he completed attendance at the university and began working.

At his deportation hearing, in August 1981, Saldana conceded that he had failed to comply with the conditions of student status under which he had been authorized to remain in the United States. The Immigration Judge (IJ) continued the hearing to allow Saldana time to file for adjustment of status and for suspension of deportation. In November 1981, at the continued hearing, the IJ found Saldana deportable based on his admissions to the charges against him, and granted him voluntary departure. At this hearing, Saldana admitted that he could not establish extreme hardship to qualify for suspension of deportation. In addition, the IJ found that Saldana could not qualify for adjustment of status because his first wife, upon their divorce, had withdrawn her application to classify him as a near-relative. In April 1983, the BIA denied Saldana's appeal of the IJ's decision.

In March 1983, Saldana married a widow, Graciela, with whom he had been friends for twelve years and whose first husband had been shot and killed in July 1982. Graciela has been a permanent resident of the United States since June 1967, and has four young children from her prior marriage

who are United States citizens. In addition, in December 1983, Graciela gave birth to a fifth child. Saldana is the child's father.

In July 1983, Saldana filed a motion to reopen the deportation proceedings to apply for suspension of deportation under section 244 of the Immigration and Naturalization Act (INA), 8 U.S.C. § 1254(a) (1982). Saldana alleged in the motion that his deportation would result in extreme hardship to himself and his family. He asserted that he had attended school in the United States for nine years, worked as a "punch-press operator" in South Gate for the past fifteen years, that all his friends were in this country, that he had a permanent resident sister here, that he sent $125.00 per month to his mother in Peru, and that severing his ties with the United States would render him unable to further support his mother, wife, and prospective child. The BIA denied this motion stating that Saldana had failed to establish the required prima facie eligibility for suspension of deportation. The BIA found that Saldana and Graciela had known of the possibility of Saldana's deportation before both their marriage and Graciela's subsequent pregnancy. The Board also found no merit in petitioner's contention that he could earn more money in the United States as a "punch press operator" than he could in Peru, with the benefit of his political science degree.

In October 1983, Saldana filed a motion to reconsider the BIA's denial of his motion to reopen to permit him to apply for suspension of deportation. In the motion to reconsider, Saldana's counsel alleged, among other things, that when he originally filed the motion to reopen he was unaware that Saldana was supporting Graciela's four children from her former husband. In support of the motion for reconsideration, Saldana submitted affidavits indicating that he was the sole support of his wife and family. He also submitted a psychiatric-medical report which indicated the special extreme hardships which Graciela and her children would encounter if Saldana were deported so soon after the violent death of Graciela's first husband. The BIA denied reconsideration upon its finding that Saldana had again failed to make a prima facie showing of extreme hardship. Saldana appeals from the BIA's rulings.

DISCUSSION

Section 244 of the Immigration and Nationality Act (INA) provides that an alien is eligible for suspension of deportation if he has resided continuously in the United States for seven years, is of good moral character, and "is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence...." 8 U.S.C. § 1254(a)(1) (1982).

While issues concerning suspension of deportation usually arise in an alien's deportation hearing, they can arise, as they did here, on a motion to reopen or a motion to reconsider the denial of a motion to reopen after the IJ has ordered deportation. The BIA may reopen or reconsider any case in which it has rendered a decision, either on its own motion or on the motion of the affected alien. 8 C.F.R. § 3.2, 3.8(a) (1984); *Chudshevid v. INS,* 641 F.2d 780, 783 (9th Cir.1981).

■ A motion to reopen must be based upon new material evidence which was not available and which the alien could not have discovered or presented at the prior hearing. 8 C.F.R. § 3.2 (1984); *Batoon v. INS,* 707 F.2d 399, 401 (9th Cir.1983) (citing *INS v. Wang,* 450 U.S. 139, 140–41, 101 S.Ct. 1027, 1029, 67 L.Ed.2d 123 (1981) (per curiam)). A motion to reconsider, on the other hand, merely needs to "state the reasons upon which the motion is based" and "be supported by such precedent decisions as are pertinent." 8 C.F.R. § 3.8(a) (1984). There is no requirement that motions to reconsider be based on allegations of new fact or even new precedent. *Chudshevid,* 641 F.2d at 784.

A. *Standard of Review*

■ Motions to reopen and motions to reconsider are not substitutes for hearings.

The function of the BIA in dealing with these motions is not to determine whether the alien is eligible for relief under section 1254(a)(1). Rather, the BIA merely must determine whether the alien has set forth a prima facie showing that deportation will result in extreme hardship. *See Reyes v. INS*, 673 F.2d 1087, 1089 (9th Cir.1982); *Hamid v. INS*, 648 F.2d 635, 636 (9th Cir. 1981). The BIA has the discretion to construe "extreme hardship" narrowly. *INS v. Wang*, 450 U.S. 139, 145, 101 S.Ct. 1027, 1031, 67 L.Ed.2d 123 (1981). However, the exercise of its discretion must not be " 'arbitrary, irrational, or contrary to law.' " *Reyes*, 673 F.2d at 1089 (quoting *Santana-Figueroa v. INS*, 644 F.2d 1354, 1355 (9th Cir.1981) ). We should review the BIA's exercise of discretion concerning motions to reopen and motions to reconsider under an abuse of discretion standard. *Id.*

### B. *Merits*

While the immigration authorities may construe "extreme hardship" narrowly when dealing with suspensions of deportation, *INS v. Wang*, 450 U.S. at 144–45, 101 S.Ct. at 1031, the BIA nonetheless abused its discretion in finding that Saldana had not made a prima facie showing of "extreme hardship."

 The BIA did not properly consider all the factors relevant to the "extreme hardship" determination. When the BIA distorts or disregards important aspects of the alien's claim, denial of relief is arbitrary, and the BIA is considered to have abused its discretion. *Santana-Figueroa v. INS*, 644 F.2d 1354, 1356 (9th Cir.1981). *See also, Zavala-Bonilla v. INS*, 730 F.2d 562, 567 (9th Cir.1984) (the BIA must consider all circumstances relevant to the hardship determination). Further, when the BIA dismisses an alien's claims with conclusory or laconic statements, this court may conclude that the BIA has abused its discretion by failing to " 'give reasons which show that it has properly considered

the facts which bear on its decision.' " *Prapavat v. INS*, 662 F.2d 561, 562 (9th Cir.1981) (per curiam) (quoting *Mejia-Carrillo v. INS*, 656 F.2d 520, 522 (9th Cir. 1981) ). *See also De La Luz v. INS*, 713 F.2d 545, 546 (9th Cir.1983) (per curiam) (BIA must view situation realistically).

 Saldana alleges that his deportation would result in "extreme hardship" due to his unique family situation. Specifically, he alleges that his deportation, so soon after the death of his wife's former husband and his four step-children's natural father, would have a traumatic psychiatric effect on them. The psychiatric report Saldana submitted supports this allegation:

> It is our opinion, the rupture of this family unit thru the forced deportation of Mr. Saldana, would precipitate a family crisis and cause undue and lasting psychological damage to Graciela, the unborn child and the existing children. Graciela could potentially be suicidal or suffer a severe post-partum depression which also would seriously affect the baby and the children.

Saldana's statements in his affidavit, attached to his motion to reconsider, further support his contention of extreme hardship. In this affidavit, Saldana swore that he loved his wife and step-children dearly and that his deportation would cause them all extreme hardship. Furthermore, Saldana alleged that if he were deported he was certain he could not find sufficient employment in Peru to support his family.[1]

Graciela also executed an affidavit in October 1983, in which she swore that if her husband were deported she would have to give birth to their child alone and that she would be unable to support all her children. She further asserted that while she could not bear to live without Saldana, she would not remove her children from the United States to be brought up in Peru.

The BIA's interpretation of the psychiatric report which Saldana submitted typified

---

**1.** In this country, Saldana has been employed for the past 15 years as a "punch press operator"

for the Weiser Lock Company in South Gate.

the extremely generalized manner in which it considered all of Saldana's evidence of extreme hardship:

> We further find that the psychiatric report dated October 19, 1983, reflecting that the respondent, wife and children could all experience different degrees of depression and some sense of disorientation upon respondent's deportation, fails to materially change the degree of hardship to the respondent and his family. . . .

The BIA's conclusory treatment of Saldana's situation "gave no individualized consideration to the particulars" of the case. *See Prapavat,* 662 F.2d at 562. The BIA gave no recognition to the trauma Saldana's wife, child, and step-children would experience if the INS deported their alleged source of emotional and economic security so soon after the death of his wife's former husband and his step-children's natural father.

The fact that the BIA failed to discuss the trauma that Saldana's deportation would create to his family is particularly disturbing in the present case. The INS's brief opposing Saldana's motion to reconsider mischaracterized Saldana's situation by alleging that "[w]hile the mother in this case *is divorced* from the father of the children, there is no indication that the children do not continue to enjoy the love, affection, and support of the natural father." (Emphasis added.) The decision of the BIA denying reconsideration mentioned neither the fact that Graciela's first husband had been killed, nor the possibility of trauma to the wife, step-children, and child that allegedly would result from petitioner's deportation so soon after that death. Thus, although the BIA did, briefly, take note of the psychiatric report, it is entirely unclear whether the BIA believed the first husband dead or merely divorced when it made its decision. The distinction between the effects of divorce and death certainly would have had some impact upon the BIA's analysis of extreme hardship. If the natural father were dead, deportation presumably would result in more hardship to the family. While the BIA made passing

reference to potential family hardship, such general references do not discharge the Board's duty to " 'give reasons which show that it has properly considered the facts which bear on its decision.' " *Prapavat,* 662 F.2d at 562 (quoting *Mejia-Carrillo,* 656 F.2d at 522). For example, the BIA's cursory references to the psychiatric report and to "degrees of depression" does not tell us what weight the BIA gave to the medical evidence that Graciela and her children could be severely traumatized if Saldana were deported. *Id.* Such conclusory statements that the BIA has considered all factors fail adequately to reveal the BIA's reasoning and constitute an abuse of discretion. *Zavala-Bonilla,* 730 F.2d at 568.

■ The BIA erred in one additional respect as well. In concluding that Saldana failed to establish a prima facie case of extreme hardship, the BIA seemed to rely heavily upon the fact that Saldana married Graciela when both were "well aware of the possibility of [Saldana's] deportation from the United States." Several problems arise from the BIA's reliance upon this fact.

If the BIA implicitly concluded that it legally could not consider hardship to Graciela or her children because of the "eleventh hour" marriage, it had no legal basis for doing so. The BIA never alleged that Saldana's marriage to Graciela was a sham, or fraudulent from the inception. And, the cases are clear that the word "spouse" in the Immigration and Naturalization Act includes the parties to all marriages that are legally valid and not sham. *See Dabaghian v. Civiletti,* 607 F.2d 868, 869 (9th Cir. 1979). Thus, if the BIA failed to consider that Graciela and her children were the wife, step-children, and child of Saldana because of a belief that the BIA could not do so legally, it acted contrary to law and therefore abused its discretion. *See Ramirez-Gonzalez v. INS,* 695 F.2d 1208, 1211 (9th Cir.1983) (BIA erred in failing to consider breakup of family in hardship determination).

If, on the other hand, the BIA did not implicitly conclude that Graciela could not be considered Saldana's wife, but simply that she and her children would face less hardship because they always knew of the possibility of his deportation, this conclusion might arguably be within its authority. The only difficulty with such reasoning is that, again, the statement is very generalized and does not give individualized consideration to the unusual family loss in the present case and to the fact that Saldana and Graciela had been friends for many years. *See Prapavat,* 662 F.2d at 562.

The real problem in this case is that the BIA failed to articulate what it found problematic about the fact that the marriage was near to the time of deportation. This failure makes it difficult for us to evaluate the BIA's decision. Again, failure of the BIA to establish that it properly reached its conclusions constitutes abuse of discretion. *Prapavat,* 662 F.2d at 562.

Appellee's primary argument seems to be that courts have found that there is no abuse of discretion in suspension of deportation cases involving hardship more extreme than in the present case. This contention is unpersuasive. It would not be helpful to compare at length the fact patterns of other cases that have found the presence or absence of "extreme hardship." It is difficult to compare situations of extreme hardship. A great deal depends on minor situational variations. For each case the INS cites in support of its determination of no extreme hardship in the instant case, there are cases with similar fact patterns that go the other way.

For these reasons, we find that the BIA has abused its discretion in denying Saldana's motion to re-open and motion to reconsider. Upon remand, the BIA must demonstrate that it fully considered Saldana's claim of extreme hardship in light of his individualized circumstances. Moreover, rather than merely looking to a dated record, the BIA should examine the issue of extreme hardship in light of current circumstances. *See Chookhae v. INS,* 756 F.2d 1350 (9th Cir.1985) (per curiam).

REVERSED and REMANDED for further proceedings consistent with this opinion.

GOODWIN, Circuit Judge, dissenting.

I respectfully dissent. This case is controlled by *INS v. Jong Ha Wang,* 622 F.2d 1341 (1980), *rev'd.* 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981).

It is not often that two cases are so substantially parallel. In both *Wang* and *Saldana* deportability was virtually conceded and was so ordered by the Immigration Judge, who was affirmed by the Board of Immigration Appeals. In both cases the aliens sought to invoke the statutory discretionary power of the Attorney General, exercised by the BIA, to suspend deportation under § 244 of the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(1).

In *Wang* the motion to reopen, *see* 8 C.F.R. § 3.2, was not substantiated by affidavits or other proofs of the facts alleged. Saldana's attorney, who undoubtedly learned from *Wang,* submitted affidavits and statements supporting the allegations in the motion to reopen. In both cases we attempted to substitute our discretion for that of the agency and ordered the proceedings reopened to find hardship.

Despite the sizeable number of cases that have come before us involving 8 C.F.R. § 3.2, this court seems not to have adhered to a cohesive standard of review of Board actions in this area. While the Supreme Court has severely restricted our review of the Board's discretionary actions, *see INS v. Phinpathya,* 464 U.S. 183, 104 S.Ct. 584, 589 n. 6, 78 L.Ed.2d 401 (1984) (whether to grant a motion to reopen "is entirely within BIA's discretion"), this court still finds cases in which we reverse under an abuse of discretion standard because we disagree with the Board's discretion.

Several of our post-*Wang* cases have recognized the limited role of this court in reviewing Board decisions not to reopen deportation proceedings. *See Ahwazi v. INS,* 751 F.2d 1120, 1122–23 (9th Cir.1985)

("The scope of our review is further circumscribed by the discretion conferred upon the Attorney General ... [which] *extends beyond* requiring proof of a prima facie case." [emphasis original]); *Samimi v. INS,* 714 F.2d 992, 994 (9th Cir.1983) ("The BIA has sole discretion to determine under what circumstance a proceeding should be reopened."); *Sida v. INS,* 665 F.2d 851, 854 (9th Cir.1981) ("BIA has discretion to deny a motion to reopen even if the alien establishes a prima facie case").

Despite these genuflections in the direction of *Wang,* our cases from time to time seem to favor a broader review of cases arising under either the regulation (motion to reopen) or the statute (definition of extreme hardship), in some cases finding support in pre-*Wang* decisions. In *Samimi,* after noting that the granting a motion to reopen is within the sole discretion of the BIA, 714 F.2d at 994, we concluded that "refusing to reopen when the petitioner has presented a prima facie showing" is reversable as an abuse of discretion. 714 F.2d at 995. In *Reyes v. INS,* 673 F.2d 1087, 1089 (9th Cir.1982), we held that "[t]he responsibility of this court is to review the Board's exercise of discretion [in construing extreme hardship] to guard against abuse. When the Board distorts or disregards important aspects of the alien's claim, denial of the alien's motion to reopen is arbitrary and the Board has abused its discretion," [citing *Santana-Figueroa v. INS,* 644 F.2d 1354, 1355 (9th Cir.1981)]. In *Batoon v. INS,* 707 F.2d 399, 401 (9th Cir.1983), we held that this court reviews denial of a motion to reopen for an abuse of discretion: "[t]he BIA may not act in any way that is arbitrary. irrational, or contrary to law.... It must consider all relevant factors cumulatively in deciding whether extreme hardship has been established." [citation omitted].

The majority fails to cite *Chae Kim Ro v. INS,* 670 F.2d 114 (9th Cir.1982), which is closely on point. In that case, petitioners moved to reopen deportation proceedings based upon the birth of an American-citizen child, whose birth occurred after the Immigration Judge had denied their application for suspension of deportation. We held that, although the BIA has discretion "in determining in what circumstances a proceeding should be reopened," 670 F.2d at 226, it abused its discretion in not reopening the proceeding to consider evidence of the newly born child. *Id.* As in the present proceedings, the BIA should have reopened if *Chae Kim Ro* is read as holding that the birth of a citizen child confers on the deportable alien an automatic right to reopening. But such a reading is inconsistent with *Wang,* and accordingly the case must be considered as falling among our aberrations in the field.

We have muddled the distinction between our review of a denial of a motion to reopen and review of a Board determination that extreme hardship had not been shown. If the former is reviewable at all under *Wang,* then is is subject to only very deferential review.

I realize that these cases are difficult, and in many of them the equities tend to favor the alien, but unless we reconcile ourselves to following the *Wang* decision, we merely invite more difficult cases and probably hold out false hopes. Under §§ 224(a)(1), Congress has delegated to the Attorney General and his delegates the decision whether to reopen a deportation proceeding. The Attorney General's regulations, 8 C.F.R. § 3.2, commit that discretion to the BIA, not to this court.

If the majority opinion prevails here one would believe the Supreme Court must either reverse us again or overrule *Wang.* I would affirm.