**Robinson Antonio MARTI–XIQUES, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 82–6141.

United States Court of Appeals, Eleventh Circuit.

Sept. 10, 1984.

Stephen H. Broudy, Timothy Harrington, Fort Lauderdale, Fla., for petitioner.

Lauri Steven Filppu, U.S. Dept. of Justice, James A. Hunolt, I.N.S., Washington, D.C., Elena R. Stinson, Juan, P.R., for respondent.

Before TJOFLAT and CLARK, Circuit Judges, and GOLDBERG *, Senior Circuit Judge.

---

* Honorable Irving L. Goldberg, U.S. Circuit Judge for the Fifth Circuit, sitting by designa-

CLARK, Circuit Judge:

Section 244(a)(1) of the Immigration and Nationality Act ("Act")[1] permits the Attorney General, in his discretion, to suspend deportation and adjust the status of an otherwise deportable alien who, *inter alia,* "has been physically present in the United States for a continuous period of not less than seven years...." Similarly, § 212(c)[2] provides discretionary relief to aliens "who temporarily proceeded abroad voluntarily" and "who are returning to a lawful unrelinquished domicile of seven consecutive years...."[3] In this appeal, we must determine whether appellant has satisfied these seven-year eligibility requirements. A previous panel of this court decided that although appellant had not met the "continuous physical presence" requirement of § 244(a)(1), he had retained a "lawful unrelinquished domicile of seven consecutive years" and was entitled to seek discretionary relief under § 212(c).[4] On petition for rehearing, that decision was vacated,[5] and the case was scheduled for oral argument. Having heard the arguments of counsel, we reassert the prior panel's position that petitioner is not eligible for § 244(a)(1) relief, but we further conclude that he is also ineligible for § 212(c) relief.

## I.

Petitioner, a thirty-year-old native and citizen of Colombia, became a lawful permanent resident of this country December 23, 1975. He has resided here since then and now lives in Puerto Rico with his wife and child. The conduct which led to his difficulties with immigration authorities occurred in August 1979, when he sailed a vessel to the Bahamas and took 12 Colombia citizens aboard with the intent to smuggle them into this country. He was arrested in Florida waters with the aliens aboard.

In September 1979, criminal charges were lodged against Marti-Xiques, and he pleaded guilty in federal district court to knowingly aiding another alien to enter this country illegally in violation of 8 U.S.C. § 1324(a)(1) (1982). In August 1980, the INS initiated deportation proceedings against him by issuing a show cause order, alleging that petitioner was deportable for entering the United States without inspection.[6] The INS subsequently filed an additional deportation charge, alleging that petitioner, for gain, had knowingly aided another alien to enter this country.[7]

On July 28, 1982, the immigration court found Marti-Xiques deportable as charged on both grounds. It denied his motion for discretionary relief and ordered that he depart this country voluntarily or face deportation. On November 5, 1982, the Board of Immigration Appeals affirmed, and the deportation decision became administratively final.

On appeal, petitioner does not challenge the findings of deportability. Rather, he argues that he is eligible for discretionary relief from deportation under §§ 244(a)(1) and 212(c) of the Act.[8]

tion.

1. 8 U.S.C. § 1254(a)(1) (1982).

2. *Id.* § 1182(c).

3. By its terms, § 212(c) applies only in exclusion proceedings where a resident alien has traveled abroad temporarily and where he is excludable under one of several enumerated grounds. Despite the literal language of the section, the Board interprets it to apply in deportation proceedings. The Board initially limited § 212(c)'s application in deportation proceedings to cases where a resident alien had traveled abroad temporarily. In *Francis v. INS,* 532 F.2d 268, 272–73 (2d Cir.1976), however, the Second Circuit held that the distinction between potential deportees who have traveled abroad temporarily and those who have not is irrational. The court held that equal protection requires that § 212(c) relief be available in deportation proceedings even where the alien has never left this country.

4. 713 F.2d 1511 (11th Cir.1983).

5. 724 F.2d 1463 (11th Cir.1984).

6. *See* 8 U.S.C. § 1251(a)(2) (1982).

7. *See id.,* § 1251(a)(13).

8. 8 U.S.C. §§ 1254(a)(1), 1182(c) (1982).

## II.

■ In *INS v. Phinpathya,* — U.S. —, 104 S.Ct. 584, 78 L.Ed.2d 401 (1984), the Supreme Court recently held that § 244(a)(1)'s "continuous physical presence" requirement is a strict threshold criteria to be met before the Attorney General can exercise his discretion to suspend deportation. In *Phinpathya,* respondent and her husband had stayed in this country beyond the expiration date of their visas. The INS commenced deportation proceedings against them. They conceded deportability, but sought discretionary relief under § 244(a)(1). Respondent was denied relief because she had left the United States for a three-month period and had improperly obtained a nonimmigrant visa from the United States consular office in Thailand to aid her reentry. The court of appeals had decided that she was eligible for § 244(a)(1) relief, concluding that her absence from the country was not "meaningfully interruptive" since "she intended, at all times, to return to the United States."[9] The Supreme Court reversed, finding the court of appeals' flexible "meaningfully interruptive" standard inconsistent with both the statutory scheme established and the ordinary meaning of the language used by Congress. Thus, the Supreme Court remarked that courts must "apply[ ] the "plain meaning of [Section 244(a) ], however severe the consequences" ...,[10] and concluded that respondent was not eligible for § 244(a)(1) relief.

The *Phinpathya* decision makes clear that Marti-Xiques is not eligible for discretionary relief under § 244(a)(1). The holding of the Supreme Court may be broad enough to deny § 244(a)(1) discretionary relief to an alien who leaves this country for any reason, for any length of time.[11] Even if the opinion is not that broad, however, the reason for which petitioner left this country—to smuggle aliens into the United States in violation of the Act—certainly has a "meaningful bearing on the attachment or commitment [he] has to this country...."[12] We hold, therefore, that petitioner does not satisfy the "continuous physical presence" eligibility criteria of § 244(a)(1).[13]

## III.

■ To be eligible for § 212(c) relief, an alien must have maintained a "lawful unrelinquished domicile of seven consecutive years ..." in this country. The parties agree that petitioner acquired a lawful domicile on December 23, 1975. Nonetheless, the parties disagree over whether petitioner has satisfied the seven-year requirement. The INS maintains that petitioner's lawful domicile ceased to exist approximately one month short of the required seven years, November 5, 1982, when the Board rendered its decision on deportability. Petitioner, however, argues that the requisite seven years transpired after that decision with the pendency of this appeal. The question becomes, then, by what point in time must an alien have established a "lawful unrelinquished domicile of seven consecutive years" so as to be eligible for § 212(c) discretionary relief? To ensure that we select a fair and viable cutoff date for determining eligibility for § 212(c) relief, a review of the alternatives is helpful.

### ·A.

The earliest possible cutoff date is that suggested by the Act's legislative history. In discussing the history of § 212(c), a 1950 Senate Report stated that

the proviso was intended to give discretionary power to the proper Government

---

9. *Phinpathya v. INS,* 673 F.2d 1013, 1017 (9th Cir.1982).

10. — U.S. at —, 104 S.Ct. at 590, 78 L.Ed.2d at 410 (quoting *Jay v. Boyd,* 351 U.S. 345, 357, 76 S.Ct. 919, 926, 100 L.Ed. 1242 (1956)).

11. *See* — U.S. at —, 104 S.Ct. at 593, 78 L.Ed.2d at 409 (Brennan, J., concurring).

12. *Id.*

13. *See Fidalgo/Velez v. INS,* 697 F.2d 1026 (11th Cir.1983) (alien's one-day trip to Canada interrupted her "continuous physical presence" in the United States and, therefore, destroyed her eligibility for § 244(a)(1) relief).

official to grant relief to aliens who were reentering the United States after temporary absence, who came in the front door, were inspected, lawfully admitted, established homes here, and remained for 7 years *before they got into trouble.*[14]

This view suggests that if an alien commits a deportable act before establishing a "lawful unrelinquished domicile of seven consecutive years," and he is found deportable for having committed those acts, he is ineligible for § 212(c) discretionary relief.

Fixing the cutoff date at the time a deportable act is committed would have serious drawbacks. First, in many situations, establishing such a date would prove unworkable. Although in the instant case Marti-Xiques was found deportable for committing a criminal act on a specific date, many of the grounds Congress has established for deportation either relate to the alien's status or condition, or contemplate ongoing activity.[15] Second, under the present statutory scheme, fixing such an early cutoff date would often produce harsh results. For example, an alien is deportable for becoming a public charge or institutionalized mental incompetent only if such an unfortunate fate befalls him within five years of entering the country.[16] Aside from the difficulties in ascertaining the date on which the deportable act was com-

mitted in these circumstances, the five-year outer limit would effectively preclude any alien determined deportable for mental incompetence or pauperism from eligibility for § 212(c) relief: if he acquired such a condition within five years of entering this country, obviously he could not meet § 212(c)'s seven-year eligibility period. Such a result runs contrary to the notion that because discretionary relief is remedial, preliminary standards of eligibility should be read generously so as not to "preclude the Attorney General from considering the exercise of his discretionary power to alleviate hardships."[17] For these reasons, we decline to adopt the date on which the alien "get[s] into trouble"[18] as the § 212(c) cutoff date.

### B.

An alternative cutoff date could be, as the INS urges, when the finding of deportability becomes administratively final. The Second Circuit's decision in *Lok v. INS*, 681 F.2d 107 (2d Cir.1982), supports the INS's position that a Board deportability determination terminates lawful domicile and is the relevant date for computing § 212(c)'s seven-year period. In *Lok*, as here, the Board issued its decision upholding a finding of deportability before the seven-year period of domicile had accrued.[19] As in this case, the petitioner in *Lok* did not challenge the

---

**14.** *The Immigration and Naturalization Systems of the United States,* S.Rep. 1515, 81st Cong. 2d Sess. 382 (1950) (emp. added).

**15.** For example, the Act makes the holding, adoption or expression of various "subversive" political viewpoints grounds for deportation. *See* 8 U.S.C. § 1251(a)(6) (1982).

**16.** 8 U.S.C. § 1251 (1982) provides, as here relevant:

(a) Any alien in the United States ... shall, upon the order of the Attorney General, be deported who—

\* \* \* \* \* \*

(3) hereafter, within five years after entry, becomes institutionalized at public expense because of mental disease, defect, or deficiency, unless the alien can show that such disease, defect or deficiency did not exist prior to his admission to the United States;

\* \* \* \* \* \*

(8) in the opinion of the Attorney General, has within five years after entry become a public charge from causes not affirmatively shown to have arisen after entry....

**17.** 2 Gordon & Rosenfield, *Immigration Law & Procedure* § 7.16, at p. 7–9.

**18.** S.Rep. 1515, *supra.*

**19.** In *Lok,* the Board affirmed the finding of deportability on July 20, 1976. Although Lok had lived in this country since 1959, the Second Circuit determined that, for purposes of ascertaining his eligibility for § 212(c) relief, "Lok's lawful domicile did not begin until his admission as a permanent resident in December 1971." 681 F.2d at 110. Thus, the court concluded that Lok had not satisfied § 212(c)'s seven-year eligibility period. *Id.* The instant case is factually less complicated, because the parties agree that Marti-Xiques' lawful domicile commenced on December 23, 1975.

finding of deportability on appeal but rather argued that he was eligible for § 212(c) relief because the seven-year period accrued during the pendency of his appeal. The court, however, held that Lok's lawful domicile ended when the Board's decision became final because he did not challenge the Board's findings of deportability. *Id.* at 110. The court reasoned that a petitioner who has conceded deportability cannot possess a lawful intent to remain in this country. The court stated:

> The possibility of such discretionary relief led the INS and the Courts to tolerate Lok's presence; it did not legalize his intent to remain any more than the Service's policy against deporting Lok as the spouse of a citizen.... Once Tim Lok's order for deportation was not timely challenged on the merits, he resided in the United States once again as a matter of grace, not law.[20]

Under the *Lok* rule, petitioner's domicile ended when the Board's decision became final and before the requisite seven-year period had elapsed.

The prior panel's now vacated decision rejected *Lok*, concluding that "until denial of discretionary relief is upheld [an alien's] intent to remain in this country cannot be deemed unlawful."[21] More importantly, the panel feared that, assuming the *Lok* rule applied only when the Board's finding of deportability was not appealed, adoption of the rule would encourage frivolous appeals and would ensnare only the unwary who failed to raise a "pro forma objection to the finding of deportability."[22] In view of the Ninth Circuit's recent holding that § 212(c)'s requisite seven-year period can accrue during the pendency of an appeal which *does* challenge the Board's finding of deportability,[23] those fears were not unfounded.

The *Lok* rule also has the disadvantage of making the availability of § 212(c) dependent upon the length of the administrative deportation process. Such a result produces unequal treatment by randomly benefiting those aliens who encounter delays in the administrative process while disadvantaging those aliens whose cases proceed smoothly and expeditiously. For example, under the present statute and regulations, an alien could have his hearing within a week of the issuance of a show cause order[24] and, if an oral decision is rendered, the immigration judge reads his decision into the record at the conclusion of the hearing.[25] By comparison, the show cause order in the instant case was issued on August 29, 1980, and the immigration judge did not render a decision until September 20, 1982. To allow a respondent in a deportation proceeding to benefit from delays in the administrative process seems utterly arbitrary. Such a result would be especially ironic in the instant case in view of the fact that part of the delay in this case was due to the filing of additional deportation charges against petitioner on January 15, 1981. For these reasons, in addition to those expressed by the prior panel, we decline to adopt the *Lok* rule to determine eligibility for § 212(c) relief.

### C.

Yet another possible cutoff date is the one suggested by petitioner and adopted by the prior panel: the date upon which judicial review of the Board's determination is completed. This date, however, is even more vulnerable to our reservations about the *Lok* decision than is the *Lok* case, itself. Allowing petitioner to benefit from the delays inherent in the administrative process is arbitrary and unfair enough. But allowing him to further benefit from the docket congestion which plagues the

**20.** 681 F.2d at 110 (footnote omitted).

**21.** 713 F.2d at 1516–17.

**22.** *Id.*

**23.** *Wall v. INS,* 722 F.2d 1442, 1444–45 (9th Cir.1984).

**24.** 1A Gordon & Rosenfield, *supra,* at 5–72.

**25.** *Id.* at 5–159.

federal courts[26] and to take advantage of whatever procedural dilatory tactics he can conceive of[27] is untenable. Therefore, we reject petitioner's contention that the seven-year eligibility period for § 212(c) relief should be able to accrue during the pendency of an appeal to this court.

#### D.

Having found all of the above discussed alternatives unacceptable, we now attempt to fix a cutoff date which minimizes the problems which attended those rejected alternatives. In our view, the most viable and fair cutoff date is the date upon which the INS commences the deportation proceedings, *i.e.* when the order to show cause is issued. This choice eliminates both of the problems inherent in the "time of commission of a deportable act" cutoff date. First, regardless of the grounds for deportation, the date is readily ascertainable. Second, the Attorney General's discretion in granting § 212(c) relief is not overly restricted as would be the case with the earlier cutoff date. Furthermore, fixing the cutoff date as of the time of the issuance of the show cause order also avoids the problem of tying the accrual of § 212(c)'s seven-year period to the quirks and delays of the administrative and judicial processes. Therefore, we conclude that eligibility for § 212(c) relief is determined as of the date the order to show cause is issued.

In the instant case, it is undisputed that the seven-year period did not commence until December 23, 1975, when petitioner became a lawful permanent resident. The INS issued the order to show cause on August 29, 1980. Clearly, petitioner had not established a "lawful unrelinquished domicile of seven consecutive years"[28] before the issuance of the show cause order. Therefore, petitioner is ineligible for § 212(c) relief.

#### IV.

Because petitioner fails to meet the statutory eligibility criteria, the Board's denial of his motion for discretionary relief is

AFFIRMED.

---

26. Filings in the U.S. Courts of Appeals have increased 56.6% since 1978. *See* Administrative Office of the U.S. Courts, *Federal Court Management Statistics* 129 (1983).

27. *See generally* Respondent's Petition for Rehearing at 9–11; *Wall v. INS, supra.*

28. 8 U.S.C. § 1182(c) (1982).