**Eusebio MORENO–ALANIZ, Petitioner,**

v.

**UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 85–4455**

**Summary Calendar.**

United States Court of Appeals, Fifth Circuit.

Jan. 29, 1986.

---

Before REAVLEY, HIGGINBOTHAM and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

Petitioner Eusebio Moreno-Alaniz, conceding his deportability under the charge that in 1976 he illegally entered the United States from Mexico, filed an application for discretionary suspension of deportation and adjustment of his status to that of an alien lawfully admitted for permanent residence pursuant to section 244(a)(1) of the Immigration and Nationality Act (the Act), 8 U.S.C. § 1254(a)(1). Finding that under the Supreme Court's recent decision in *INS v. Phinpathya,* 464 U.S. 183, 104 S.Ct. 584, 78 L.Ed.2d 401 (1984), Moreno was statutorily ineligible for relief because he returned to Mexico in 1978 for one week and he thus failed to meet the threshold criteria requiring that he be "physically present in the United States for a continuous period of not less than seven years," the Immigration Judge (IJ) denied his application. On appeal, the Board of Immigration and Naturalization Service (the Board) affirmed. On this appeal Moreno urges that the IJ and the Board erred in applying the holding of *Phinpathya* to his case because it constituted a marked change in the law and was not the applicable law at the time of his brief trip to Mexico in 1978. Finding no merit to Moreno's appeal, we affirm.

Ruben Montemayor, Harry A. Nass, Jr., San Antonio, Tex., for Moreno-Alaniz.

Edwin Meese, III, Atty. Gen., Dept. of Justice, Robert M. Bombough, Director, Dawn MacPhee, Asst. Director, Washington, D.C., Michael P. Lindemann, Linda B. Adams, Allen W. Hausman, David H. Lambert, Dist. Director, New Orleans, La., Richard M. Casillas, Dist. Director, San Antonio, Tex., for U.S.

I.

Moreno, a citizen of Mexico, entered the United States on February 15, 1976, without being inspected by an immigration officer. He remained in the United States until December 1978, when he returned to Mexico to get married; he returned to the United States one week later, again without inspection by immigration authorities. On January 17, 1983, an order to show cause initiated deportation proceedings against Moreno on the charge that he had entered the United States in 1976 without inspection in violation of section 241(a)(2) of

the Act, 8 U.S.C. § 1251(a)(2).[1] Moreno admitted the truth of the factual allegations in the show cause order and thereby conceded his deportability.

Pursuant to 8 U.S.C. § 1254(a)(1), Moreno also made application for suspension of deportation and adjustment of his status to that of an alien lawfully admitted for permanent status. Section 1254(a)(1) provides that the Attorney General in his discretion may grant such an application provided that an alien meets three threshold requirements. These prerequisites to eligibility are (1) that the alien has been "physically present in the United States for a continuous period of not less than seven years immediately preceding the date of the application," (2) that the alien proves that during such seven year period "he was and is a person of good moral character," and (3) that he "is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence."[2]

Upon Moreno's concession that he was deportable because he entered the United States without inspection, the only remaining issue before the IJ was Moreno's application for suspension of deportation. Finding that Moreno failed to meet the first criteria for eligibility because his one week departure to Mexico in December 1978 interrupted the seven year period of continuous physical presence in the United States, the IJ denied Moreno's application. In doing so, the IJ relied upon the Supreme Court's recent decision in *Phinpathya* interpreting section 1254(a)(1) and holding that the requirement of being "physically present" in the United States for a "continuous period" of seven years was to be interpreted literally and thus any absence from the United States during such period, regardless of the circumstances, breaks the continuity of physical presence and the eligibility of an alien for relief.[3] On appeal, the Board affirmed the IJ's decision that *Phinpathya* required that Moreno's application be denied. This appeal followed.

The thrust of Moreno's argument is that *Phinpathya* was not the law at the time he traveled to Mexico in 1978, but rather at such time Immigration Judges and the Board, in construing the eligibility requirement in section 1254(a)(1) of seven years continuous physical presence, followed the more liberal rationale of *Rosenberg v. Fleuti*, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963). Accordingly, Moreno urges that *Phinpathya* was such a departure from existing law that it should not be applied retroactively in his case; for to apply *Phinpathya* retroactively, Moreno contends, results in a manifest injustice so as to deprive him of due process of law.

In response, the Immigration and Naturalization Service (INS) urges, first, that *Phinpathya* was not applied retroactively in fact to Moreno's case because the decision's literal interpretation of "physically present" for a "continuous period" of seven years is consistent with the plain meaning of that language and the intent of Congress in inserting such language in the statute, as well as the initial interpretation

---

**1.** Section 1251(a)(2) of Title 8 provides in relevant part: "(a) Any alien in the United States (including an alien crewman) shall, upon the order of the Attorney General, be deported who . . . (2) entered the United States without inspection. . . ."

**2.** Under the Act, the Attorney General is authorized to delegate his powers. 8 U.S.C. § 1103. Under 8 C.F.R. § 2.1 (1983), the powers of the Attorney General are delegated to the Commissioner of Immigration and Naturalization, who in turn is permitted to redelegate his authority through appropriate regulations. Under 8 C.F.R. §§ 242.8, 242.21 (1983), the Commission-

er has delegated the power to consider § 244 applications for suspension of deportation to special inquiry officers, whose decisions are subject to review by the Board.

**3.** In holding that Moreno had failed to satisfy the first criteria of eligibility for suspension of deportation in that he had not been physically present for a continuous seven year period, the IJ did not reach the question of whether Moreno had satisfied the remaining two criteria dealing with Moreno's moral character and whether his deportation would work a hardship on him or his immediate family.

of the Board and the interpretation of other courts; second, that under the standards for retroactive application of a court decision, *Phinpathya* should be given retroactive effect; third, Moreno, being an alien unlawfully in this country was deprived of no vested interest by this application of *Phinpathya* to his case; and, fourth, the Supreme Court in *Phinpathya* retroactively applied its holding to the factual setting of that case. We agree with the INS that *Phinpathya* is fully applicable to Moreno's case and therefore no error resulted in the denial of his application for suspension of deportation.

## II.

In *Phinpathya* the Supreme Court had before it the question of the meaning that was applicable to the continuous physical presence language contained in section 1254(a)(1). The Court delved into the congressional history of this language and the interpretation that had been placed on it by the Board and various court decisions. The Court then concluded that "[t]he ordinary meaning of these words does not readily admit any 'exception[s] to the requirement of seven years of "continuous physical presence" in the United States to be eligible for suspension of deportation.'" 464 U.S. at 189, 104 S.Ct. at 589, 78 L.Ed.2d at 409 (quoting *McColvin v. INS*, 648 F.2d 935, 937 (4th Cir.1981)). In *Phinpathya* the alien seeking suspension of deportation had overstayed her visa and thus remained in this country without lawful authority. Her unlawful stay was interrupted, however, by a three week visit to her native Thailand, from which she returned to the United States under an improperly obtained nonimmigration visa. The Supreme Court, based upon the strict interpretation that it found was called for in construing the seven year continuous physical presence requirement of section 1254(a)(1), held that the three week trip to Thailand interrupted the continuous physical presence requirement, thereby making the alien ineligible for suspension of deportation relief.

In *Phinpathya* the Supreme Court rejected a line of decisions by the Ninth Circuit which had applied a more "generous" and "liberal" construction of the continuous physical presence requirement. The Ninth Circuit cases found as a basis for their holdings the Supreme Court's earlier decisions in *Rosenberg v. Fleuti*, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963). In *Fleuti*, the Court, in interpreting the meaning of the term "entry," as contained in section 101(a)(13) of the Act, 8 U.S.C. § 1101(a)(13), which deals with the entry into the United States of aliens having permanent residence, held that the term was to be construed to mean "an intent to depart in a manner which can be regarded as meaningfully interruptive of the alien's permanent residence." 374 U.S. at 462, 83 S.Ct. at 1812, 10 L.Ed.2d at 1008.

Taking a cue from the foregoing language in *Fleuti*, the Ninth Circuit, in a series of cases under section 1254(a)(1) held that, before an alien's departure from the United States during the seven year period can result in a finding of ineligibility, the departure must be "meaningfully interruptive." *See, e.g., Kamheangpatiyooth v. INS*, 597 F.2d 1253 (9th Cir.1979); *Git Foo Wong v. INS*, 358 F.2d 151 (9th Cir.1966); *Wadman v. INS*, 329 F.2d 812 (9th Cir. 1964).[4] Although the Board had initially

---

**4.** In *Wadman*, in determining whether there had been continuous physical presence, the Ninth Circuit adopted three factors which had been identified in *Fleuti* that should be taken into account in determining whether a departure had been "intended," that is, whether the departure was innocent, casual, and brief. In *Kamheangpatiyooth*, the Ninth Circuit further expanded its previous flexible interpretation of the continuous physical presence requirement. It found that the Board had erred when it focused on the duration of the absence from this country, its purpose, and whether travel documents were obtained and treated them as being determinative of whether there existed a continued period of physical presence. The court held that these three factors "are only evidentiary on the issue under section 244(a)(1) of whether an absence reduced the significance of the whole seven-year period as reflective of the hardship and unexpectedness of exposure to expulsion. To treat them as if they were in themselves the object of the inquiry may defeat the objectives of the statute." 597 F.2d at 1257–58 (footnote omitted). In response to this new

interpreted the continuous physical presence requirement in a strict sense, following the Ninth Circuit decisions the Board generally adopted the more liberal interpretation of the requirement espoused in these decisions. *See Matter of Jacobson*, 10 I & N Dec. 782 (BIA 1964); *Matter of Wong*, 10 I & N Dec. 513 (BIA 1964).

The Ninth Circuit's interpretation received mixed reactions from other courts. In *Heitland v. INS*, 551 F.2d 495 (2d Cir. 1977), the court, after discussing the Ninth Circuit's decision in *Wadman*, concluded that *Fleuti* "supports a liberal rather than a niggardly or technical construction of the phrase 'continuous period as used in § 244(a)(1).'" 551 F.2d at 501. In contrast, in *McColvin* the Fourth Circuit, after acknowledging that the Ninth Circuit had adopted a less than hard and fast construction of the term "continuous," stated that "[w]e think it is clear that Congress intended that the 'continuous physical presence' requirement of 8 U.S.C. § 1254(a)(1) be applied in a rigorous manner." 648 F.2d at 938.[5] Also, in *Fidalgo/Velez v. INS*, 697 F.2d 1026 (11th Cir.1983), the court, after a discussion of the Ninth Circuit's interpretation of the continuous physical presence requirement and the Congressional history of the statute, rejected the Ninth Circuit's interpretation. The court adopted the strict interpretation that the Board had initially placed on the requirement following its enactment, to wit, even a brief absence from the United States destroys eligibility for suspension of deportation.

> Our conclusion that congress intended the physical presence requirement to be applied strictly is supported by the BIA, which has "consistently held that even a brief absence from the United States destroys the continuous physical presence

required for eligibility for suspension of deportation." *Matter of Graham*, 11 I. & N. Int.Dec. 234, 235 (BIA 1965). *Contra Matter of Herrera*, I. & N. Int.Dec. # 2853 (BIA 1981) (applying *Kamheangpatiyooth* standard because case arose in Ninth Circuit).

697 F.2d at 1029.

Our own circuit prior to *Phinpathya* did not directly address the continuous presence requirement. However, in *Vargas-Gonzalez v. INS*, 647 F.2d 457 (5th Cir. 1981), we commented that an enforced one-day departure and a two-day voluntary departure during a seven year period was "arguably an insignificant departure, insufficient to interrupt continuity of presence." 647 F.2d at 459 n. 4 (citing *Kamheangpatiyooth*).

With the Supreme Court's decision in *Phinpathya*, however, any question as to meaning of the continuous physical presence requirement in section 1254(a)(1) has been dispelled. The Court unequivocally held that a strict construction, leading to no exceptions to the continuous physical presence in this country during the seven year period, is mandated. In so holding the Court carefully traced the history of the inclusion of the "physical presence" terminology in the statute. It noted that prior to 1952 the Attorney General was authorized to suspend deportation of aliens who "resided continuously in the United States for seven years or more," but that in that year Congress replaced the "continuous residence" requirement with the "continuous physical presence" requirement. This language change, the Court observed, was made by Congress in order to subvert the practice of aliens entering the country illegally or as nonimmigrants with the in-

---

standard for testing the continuous physical presence requirement, the Board in *Matter of Herrera*, Interim Decision 2853 (BIA 1981), limited the holding of *Kamheangpatiyooth* to cases arising in the Ninth Circuit.

**5.** Even though the court in *McColvin* felt a strict interpretation of continuous physical presence was called for, it found that, under the facts of the case, an alien under a deportation order who had left the United States for Canada and

returned the next day as a nonimmigrant visitor for business was not entitled to relief even under the Ninth Circuit's more liberal reading of the suspension of deportation statute. In so holding the court stressed the fact that the alien left the United States knowing that he was subject to a deportation order and thus any expectations for a future life in this country were nonexistent.

tent of establishing themselves so as to be able to obtain remedies whereby they could adjust their status to that of permanent residence, to the detriment of aliens abroad awaiting entry under a quota list. 464 U.S. at 190–91, 104 S.Ct. at 589–90, 78 L.Ed.2d at 409–10. Based on this careful rewording of the statute by Congress, the Court found that "[w]e do justice to this scheme only by applying the 'plain meaning of [Section 244(a)], however severe the consequences.'" 464 U.S. at 192, 104 S.Ct. at 590, 78 L.Ed.2d at 410 (quoting *Jay v. Boyd*, 351 U.S. 345, 357, 76 S.Ct. 919, 926, 100 L.Ed. 1242 1254 (1956)).[6]

The Court held that the Ninth Circuit erred when it applied the *Fleuti* court's "meaningfully interruptive" construction of the language in section 1101(a)(13) to the continuous physical presence requirement in section 1254(a)(1). The Court noted that "*Fleuti* dealt with a statutory exception precisely to ameliorate the harsh effects of prior judicial construction of the 'entry' doctrine," whereas *Phinpathya* "deals with a threshold requirement added to the statute specifically to limit the discretionary availability of the suspension remedy." 464 U.S. at 193, 104 S.Ct. at 591, 78 L.Ed.2d at 411.

Following the Supreme Court's decision in *Phinpathya*, the Ninth Circuit quickly fell into line. In *Dasigan v. INS*, 743 F.2d 628 (9th Cir.1984), the court denied relief to an alien who had departed the United States for the Philippines on two occasions during the period 1973 and 1982. In so holding, the court acknowledged that *Phinpathya* called for a strict construction of section 1254(a)(1) and that there should be no exceptions to the requirement that an alien be continuously physically present in the country for a seven year period.[7] Also, in *Marti-Xiques v. INS*, 741 F.2d 350 (11th

Cir.1984), the court, while not quite giving the holding in *Phinpathya* the strict no exception interpretation that the Ninth Circuit gave to it in *Dasigan*, acknowledged that it "may be broad enough to deny [§ 1254(a)(1)] discretionary relief to an alien who leaves the country for any reason for any length of time." 741 F.2d at 352.

Our court has spoken twice on the application of *Phinpathya* to suspension of deportation proceedings. First, in *Zamora-Garcia v. INS*, 737 F.2d 488 (5th Cir.1984), in ruling on the third requirement of section 1254(a)(1) that the alien demonstrate extreme hardship, the court observed that "[i]n reviewing the 'continuous physical presence' requirement of § 1254(a)(1), the Supreme Court declined to apply an interpretation other than 'plain meaning' approach to the 32 year old statute." 737 F.2d at 493. Again, most recently in *Rosa Emma Moreno v. INS*, 779 F.2d 1086 (5th Cir.1986), we held that an alien unlawfully in this country since 1966 and seeking suspension of deportation, who had made three short trips (in 1975, 1980 and 1982) to Mexico, failed to meet the continuous physical presence requirement of section 1254(a)(1). In so holding, we acknowledged the strict interpretation of this requirement mandated by *Phinpathya* which, applied to the facts of the case, required an affirmance of the Board's denial of relief.

From the foregoing, we conclude that *Phinpathya* did not constitute a departure from established law in the interpretation of the continuous physical presence requirement of section 1254(a)(1). The Ninth Circuit's "meaningful interruption" test was never acknowledged as the law by the courts nor *in toto* by the Board. This is demonstrated by the adherence to a strict interpretation test of the continuity re-

---

6. The Court further noted that in 1962 Congress again amended section 1254(a)(1) to require that an alien also had to establish that deportation would result in "extreme hardship," but that in doing so it did not change the literal "continuous physical presence" requirement. 464 U.S. at 191 n. 9, 104 S.Ct. at 590 n. 9, 78 L.Ed.2d at 410 n. 9.

7. *Dasigan* was pending before the Ninth Circuit at the time of the Supreme Court's decision in *Phinpathya* on January 10, 1984. The court, commenting that it "changed the law from what [the alien] (and this court) had previously thought and stated the law to be," 743 F.2d at 649, nevertheless applied *Phinpathya* to the factual background of the case.

quirement in *McColvin* and in *Fidalgo/Velez*, both being decisions rendered after the Ninth Circuit's adoption of the more liberal "meaningful interruption" test. Also, the Board in *Matter of Herrera* limited the applicability of the Ninth Circuit's 1979 decision in *Kamheanypatiyooth* to cases arising in that circuit. *See supra* note 4. The Board thus attempted to continue to give effect to its initial strict construction of the statute, while at the same time trying to accommodate the more liberal construction of the Ninth Circuit. Moreno's contention that the Board erred when it applied *Phinpathya* to the factual setting of his case because it was not the law at the time of his departure from the United States in 1978 is without merit.[8]

### III.

For a judicial decision, whether in a criminal or civil case, in both a constitutional or nonconstitutional setting, "to be applied nonretroactively [it] must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed...." *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106, 92 S.Ct. 349, 355, 30 L.Ed.2d 296, 306 (1971) (citing *Hanover Shoe v. United Shoe Machinery Corp.*, 392 U.S. 481, 496, 88 S.Ct. 2224, 2233, 20 L.Ed.2d 1231, 1243 (1968) and *Allen v. State Board of Elections*, 393 U.S. 544, 572, 89 S.Ct. 817, 835, 22 L.Ed.2d 1, 20 (1969)). What we have said disposes of Moreno's claim that it was error to apply *Phinpathya* retroactively to the factual background of his case, since that case does not constitute a new principle or rule of law or decide an issue of first impression whose resolution was not clearly foreshadowed. Even if it had, "[a]s a rule, judicial

decisions apply 'retroactively.'" *Solem v. Stumes*, 465 U.S. 638, 642, 104 S.Ct. 1338, 1341, 79 L.Ed.2d 579, 586 (1984). However, where the retroactive effect of a decision arises.

> [t]he criteria guiding resolution of the [retroactivity] question implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards.

465 U.S. at 643, 104 S.Ct. at 1341, 79 L.Ed.2d at 587 (quoting *Stovall v. Denno*, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967)). Even the application of the foregoing principles does not afford the conclusion that *Phinpathya* should not be applied retroactively.

The "purpose" of the holding in *Phinpathya* was the obvious one of instilling in the requirement of continuous physical presence of § 1254(a)(1) the purpose originally envisioned and intended by Congress. This results in a compelling reason for retroactive application of *Phinpathya*. Authorities charged with enforcement of the statute also relied on that original purpose until doubt arose as a result of the Ninth Circuit's liberal interpretation of the requirement. Thereafter, the Board limited the application of the last and most recent liberal interpretation enunciated in *Kamheangpatiyooth* only to cases arising in the Ninth Circuit. Finally, in *Phinpathya* the Supreme Court emphasized that the alien in that case was in this country unlawfully and subject to deportation at any time. The Court noted that Congress had the detrimental effect of the influx of illegal aliens on the whole immigration scheme in mind when it added the "physical" pres-

---

**8.** We note that although this contention was not raised in either *Dasigan, Marti-Xiques,* or *Moreno,* none of those courts had any hesitancy in applying *Phinpathya* to the factual settings of those cases. In each case the departures which assertedly interrupted the continuity of the aliens physical presence occurred during the period when the Ninth Circuit had adopted its liberal interpretation of the statutory scheme for suspension of deportation proceedings.

It is also of significance that the Supreme Court in *Phinpathya* made special note of the fact that "[o]ur decision today frees the INS from the strictures of *Wadman* and interprets the language as Congress has written it." 464 U.S. at 196 n. 13, 104 S.Ct. at 592 n. 13, 78 L.Ed.2d at 413 n. 13.

ence requirement to section 1254(a)(1) in 1952. Through the addition it sought to stringently limit the right of those aliens unlawfully in this country to gain permanent status. Accordingly, the administration of justice is well served by the application of the holding in *Phinpathya* to the factual setting of Moreno's case.

The Board's denial of suspension of deportation relief is AFFIRMED.