United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 7, 2003**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 02-10198

_____

TOMMY THOMPSON, SECRETARY,
DEPARTMENT OF HEALTH & HUMAN SERVICES,

                                        Plaintiff-Appellant,

v.

STEPHEN GOETZMANN; ET AL.,

                                        Defendants,

STEPHEN GOETZMANN; BERNICE LOFTIN;
ZIMMER, INC.,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northen District of Texas

_____

ON PETITION FOR REHEARING EN BANC

(Opinion December 17, 2002, 5th Cir. 2002, ___F.3d___)

Before JOLLY, DUHÉ, and WIENER, Circuit Judges.

PER CURIAM:

On petition for rehearing, we amend our opinion by deleting Part B.4, titled "Zimmer Cannot Pay for Medical Services 'Promptly,' and Thereby Fails the MSP Statute's Requirement for a 'Self-Insurance Plan,'" in its entirety, and deleting, in Part B.2, the italicized portion of the following sentence: "*Although we agree with the district court's determination that Zimmer is not liable under the MSP statute because it could not be reasonably*

*expected to pay 'promptly' for Loftin's medical care*, we also agree with the other district courts that have concluded that an alleged tortfeasor who settles with a plaintiff is not, ipso facto, a 'self-insurer' under the MSP statute."

These withdrawn portions of the opinion addressed the holding of the district court that the tort settlement —— the ad hoc settlement agreement entered into between Zimmer and Loftin in the course of Loftin's products-liability lawsuit against Zimmer —— from which the government was seeking reimbursement under the MSP statute was not a "self-insurance plan" within the meaning of § 1395y(b)(2)(A)(ii), because the purported self-insurance plan could not have been expected to "pay promptly" for Loftin's healthcare services. As that part of the opinion was an alternative holding, our withdrawal of these portions of the opinion does not affect the central holding of our decision that the government lacked authority under the MSP statute to seek reimbursement from the Zimmer.

Notwithstanding the foregoing withdrawals, we remain convinced that the plain language of the MSP statute makes the reasonable expectation of a prompt payment a requirement for the government's collection from those "primary plans" listed in § 1395y(b)(2)(A)(ii), including a self-insurance plan. In short, under the language of § 1395y(b)(2)(B)(i), which expressly cross-references § 1395y(b)(2)(A)(i)-(ii), absent an expectation of

prompt payment, the government has no cause of action to collect from a "self-insured plan," or from any of the other primary plans enumerated in § 1395y(b)(2)(A)(ii).

As a result of arguments made for the first time in the government's petition for rehearing, however, we concede that it is arguable that this plain language of the statute produces an absurd result: The MSP statute seeks to cast Medicare as the secondary payer in virtually all situations in which there is any other insurance, providing a cause of action for reimbursement to Medicare from such insurance funds and allowing the government to intervene in litigation between the beneficiary and the primary insurer when the primary insurer is disputing the beneficiary's claim. Yet, at the same time, the plain language of this statute requires a reasonable expectation of prompt payment from the primary insurer. As a practical matter, this requirement precludes the right to reimbursement from any disputed or potentially disputed funds. Furthermore, the plain language of the MSP statute permits a reimbursement action with respect to the "primary plans" enumerated in § 1395y(b)(2)(A)(ii) only in situations in which Medicare usually would not make conditional payments, that is, when it is reasonably expected for "payment . . . to be made promptly" by the "primary plan."

Because our holding with regard to the prompt payment requirement was an alternative holding, and because there is no

3

necessity for us to grapple with whether the arguably absurd results may somehow militate against enforcing the plain language of the statute, we delete the above-noted portions of the opinion. In all other respects, the opinion remains unchanged.

Finally, we reiterate that the courts are not in the business of amending legislation. If the plain language of the MSP statute produces the legislatively unintended result claimed by the government, the government's complaint should be addressed to Congress, not to the courts, for such revision as Congress may deem warranted, if any.

Except as provided in this order, the petition for rehearing and the petition for rehearing en banc are DENIED. This court's opinion, 315 F.3d 457 (5th Cir. 2002), is hereby withdrawn, and the following opinion is substituted:

Plaintiff-Appellant Tommy Thompson, Secretary of the United States Department of Health & Human Services ("government") appeals from the district court's dismissal of complaints against (1) Defendant-Appellee Zimmer, Inc. ("Zimmer"), pursuant to FED. R. CIV. P. 12(b)(6), and (2) Defendant-Appellee Bernice Loftin and her attorney, Defendant-Appellee Stephen Goetzmann, by summary judgment in their favor. The government had filed suit against all three Defendants-Appellees, seeking reimbursement for Medicare expenditures related to Loftin's medical treatment. This was the same treatment that was the genesis of Loftin's retaining Goetzmann

4

to sue Zimmer, the manufacturer of her artificial hip prosthesis, which suit was settled prior to trial. Concluding that the government's complaint is without any basis in law and that there is no legal right of recovery against these three parties, we affirm the district court's dismissal of the government's action.

## I. FACTS & PROCEEDINGS

In June 1993, Loftin underwent surgery to replace her hip joint with a prosthesis manufactured by Zimmer. That procedure was paid for by the government through the Medicare program. Complications arose, requiring Loftin to undergo a second surgery. Thereafter, Loftin continued to experience medical problems related to her hip prosthesis. Medicare paid approximately $143,881.82 for Loftin's two surgeries and subsequent medical treatment.

Representing Loftin, Goetzmann filed suit against Zimmer for products liability, alleging defective design of the hip prosthesis. Lofitn's claims included the medical expenses paid for by Medicare. Loftin and Zimmer settled in lieu of going to trial. Without admitting liability, Zimmer paid Loftin the unitemized lump sum of $256,000. Zimmer disbursed the full amount of the settlement to Goetzmann, who, after deducting his 40% contingency fee, distributed the balance to Loftin. The entire settlement was paid by Zimmer; no part was paid from insurance.

In October 2000, the government filed suit against Goetzmann, Loftin, and Zimmer under the Medicare Secondary Provider ("MSP")

5

statute,[1] which authorizes the government to seek reimbursement from entities providing primary insurance coverage for medical services previously paid by Medicare. Among other things, the MSP statute authorizes the government to obtain reimbursement from a firm or entity that has a "self-insurance plan."[2]

The government alleged that Zimmer was "self-insured for its liability to Loftin," which, as a putative tortfeasor settling Loftin's products-liability action against it, had paid Loftin a substantial sum of money. This payment, insisted the government, was ostensibly for Loftin's medical expenses, which were originally paid for by the Medicare program. Claiming entitlement to relief under the MSP statute and its implementing regulations, the government sought reimbursement from Goetzmann and Loftin, and double damages from Zimmer.

Zimmer moved to dismiss the government's complaint against it under Rule 12(b)(6) for failure to state a claim on which relief could be granted. Zimmer asserted that its tort settlement with Loftin was not tantamount to maintaining a "self-insurance plan," as defined in the MSP statute. Zimmer argued, in the alternative, that its inability to pay for Loftin's medical services "promptly," as required by the MSP statute, precluded it from meeting the definition of a "self-insured plan." The district court declined

---

[1] 42 U.S.C. § 1395y(b) (2002).

[2] § 1395y(b)(2)(A)(ii).

6

to determine, on a motion to dismiss, whether Zimmer's settlement agreement with Loftin met the statutory definition of a "self-insured plan." The district court nonetheless ordered the government's complaint dismissed, holding that, as a matter of law, Zimmer could not have paid for Loftin's medical services "promptly," as required by the MSP statute.

Goetzmann and Loftin subsequently moved for summary judgment, arguing that they were not required to reimburse Medicare because they did not receive payment from an insurer or self-insured entity. Agreeing with Goetzmann and Loftin that the MSP statute predicates their reimbursement liability on their receipt of payment from, inter alia, a self-insurance plan that would pay "promptly" for medical services, the district court granted summary judgment to both Goetzmann and Loftin. The government timely filed a notice of appeal from the court's dismissals of Zimmer, Goetzmann, and Loftin.

## II. ANALYSIS

A. Background.

Although the government has litigated similar cases in several district courts around the country, we are the first appellate court to address the issue of an alleged tortfeasor's reimbursement liability under the MSP statute. Notably, the government's prior

7

efforts have proved uniformly feckless —— every court that has heard its arguments on this issue, including the district court in the instant case, has rejected the government's expansive interpretation of the MSP statute.

In this case, the government retreads the same unsuccessful arguments that it has advanced in these prior cases. As we conclude that the statutory analyses performed by the district courts in the prior cases are sound, that the law has not changed, and that the government has not adduced any new facts that require us to reconsider the meaning or scope of the MSP statute, we affirm the district court's decision in this case. We shall first discuss the government's claims against Zimmer, because the liability of Goetzmann and Loftin is predicated on determining whether Zimmer qualifies as having a "self-insured plan" under the MSP statute.

B.    Zimmer's Reimbursement Liability Under the MSP Statute.

1.    Standard of Review.

A district court's order dismissing a complaint under Rule 12(b)(6) is reviewed <u>de</u> <u>novo</u>.[3]    On appeal, we must liberally construe the complaint and assume that all facts pleaded therein are true,[4] keeping in mind that such dismissals of complaints are

_____

[3] <u>Lowrey v. Tex. A&M Univ. Sys.</u>, 117 F.3d 242, 246 (5th Cir. 1997).

[4] <u>Id.</u> at 247 (citing <u>Campbell v. Wells Fargo Bank</u>, 781 F.2d 440, 442 (5th Cir. 1986)).

8

"viewed with disfavor."[5]   We must also remain mindful of the Supreme Court's injunction that a Rule 12(b)(6) motion should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief."[6]

2.   Zimmer's Settlement Agreement with Loftin is Not a "Self-Insurance Plan" Under the MSP Statute.

The government contends that Zimmer is liable for reimbursing the government's Medicare expenditures by virtue of Zimmer's having a "self-insurance plan" because Zimmer was "required or responsible" to make healthcare-related payments to Loftin, a Medicare recipient.  The government's argument for holding Zimmer liable under the MSP statute is relatively straightforward: (1) The legislative history reflects that the purpose of the MSP is to reduce Medicare expenditures, (2) the statute achieves this purpose by requiring reimbursement of payments from any "self-insurance plan,"[7] (3) an entity is "self-insured" if it is "required or responsible" for making payments to a Medicare recipient,[8] and (4) the MSP statute provides a right of recovery to the government in seeking reimbursement from such "self-insurance plans" that have

---

[5] <u>Kaiser Aluminum & Chem. Sales v. Avondale Shipyards</u>, 677 F.2d 1045, 1050 (5th Cir. 1982).

[6] <u>Conley v. Gibson</u>, 355 U.S. 41, 45–46 (1957).

[7] § 1395y(b)(2)(A)(ii).

[8] § 1395y(b)(2)(B)(ii).

9

paid monies to Medicare recipients.[9]  In this case, the "self-insurance plan" is alleged by the government to exist by virtue of Zimmer's payment to Medicare recipient Loftin  under the terms of their products-liability settlement agreement.  Thus, the government concludes, Zimmer (as well as Goetzmann and Loftin) must reimburse the government for its Medicare expenditures because this is in accord with the legislative intent underlying the MSP statute.

In assessing whether the MSP statute applies to Zimmer's settlement agreement with Loftin, we must start with the actual words of the MSP statute,[10] for it is the words of the statute that set the metes and bounds of the authority granted by Congress.[11] Thus, we need not —— and, indeed, should not —— look to legislative history when the statute is clear on its face.  When "the language of the federal statute is plain and unambiguous, it begins and ends our enquiry."[12]

The terms and structure of the MSP statute aptly reflect its

---

[9] Id.

[10] Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997) (recognizing that the "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning").

[11] Blue Cross & Blue Shield of Tex. v. Shalala, 995 F.2d 70, 73 (5th Cir. 1993) (noting that the words of a statute reflect the intention of Congress, and "Congress's intention is the law and must be followed").

[12] United States v. Osborne, 262 F.3d 486, 490 (5th Cir. 2001).

general purpose.  In enacting this law, Congress laudably sought to reduce Medicare costs by making the government a secondary provider of medical insurance coverage when a Medicare recipient has other sources of primary insurance coverage.[13]  The MSP statute states, in pertinent part, that:

> Payment under [the Medicare program] may not be made . . . with respect to any item or service to the extent that
>
> (i)        payment has been made, or can reasonably be expected to be made, . . . as required [under a group health plan], or
>
> (ii)       <u>payment</u> has been made or <u>can reasonably be expected to be made promptly</u> (as determined in accordance with regulations) under a workmen's compensation law or plan of the United States or a State or <u>under</u> an automobile or <u>liability insurance policy or plan (including a self-insurance plan)</u> or under no fault insurance.
>
> In this subsection, the term "<u>primary</u> <u>plan</u>" means a group health plan or large group health plan, to the extent that clause (i) applies, and a workman's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance, to the extent that clause (ii) applies.[14]

The MSP statute also authorizes the government to make <u>conditional</u> healthcare payments when a Medicare recipient already has coverage provided by a primary insurance plan; and the government has a right of action in reimbursement to recover these conditional healthcare payments from such primary plans:

---

[13] <u>Blue Cross & Blue Shield of Tex.</u>, 995 F.2d at 70-73.  <u>See also</u> <u>In re Silicone Gel Breast Implants Prods. Liab. Litig.</u>, 174 F. Supp. 2d 1242, 1250 (N.D. Ala. 2001) (summarizing the purpose and structure of the MSP statute).

[14] § 1395y(b)(2)(A) (emphasis added).

11

(i) <u>Primary</u> <u>Plans</u>

Any payment under this subchapter . . . shall be conditioned on reimbursement to the appropriate Trust Fund established by this subchapter when notice or other information is received that payment for such item or service has been or could be made under such subparagraph. . . .

(ii) Action by United States

In order to recover payment under this subchapter for such an item or service, the United States may bring an action against any entity which is <u>required or responsible</u> (directly, as a third-party administrator, or otherwise) to make payment with respect so such item or service (or any portion thereof) under a <u>primary plan</u> . . ., or against any other entity (including any physician or provider) that has received payment from that entity with respect to the item or service, and may join or intervene in any action related to the events that gave rise to the need for the item or service. . . .[15]

Thus, the structure of the MSP statute is relatively simple. If a Medicare recipient has medical insurance provided through a "primary plan," then Medicare is precluded from paying for medical services except to provide secondary coverage. Stated differently, Medicare serves as a back-up insurance plan to cover that which is not paid for by a primary insurance plan.

A "primary plan" is defined as a group health insurance plan, or as any another type of insurance <u>plan</u>, such as workman's compensation, liability insurance, or a self-insurance plan, that may reasonably be expected to pay for services promptly. "Promptly" is defined by the Health Care Financing Administration ("HCFA") regulations as payment within 120 days after the <u>earlier</u> of (1) the date the claim is filed, or (2) the date the service was

---

[15] § 1395y(b)(2)(B) (emphasis added).

provided or the patient was discharged from the hospital.[16]  If the Medicare program chooses to make conditional payments when a Medicare recipient has coverage under a primary plan, then the government may seek reimbursement for these payments by suing the insurance entities that provide the primary coverage.

To entice us to consider the lengthy and abstruse legislative history of the MSP statute, the government urges us to agree with it that the statute is ambiguous; however, we decline to find ambiguity where none exists.[17]  As ably pointed out by Zimmer and amici curiae, the term "self-insurance plan," as used in the MSP statute, is not only clear in its meaning; it plainly does not apply automatically to alleged tortfeasors, such as Zimmer, who settle with plaintiffs.  We also agree with the other district courts that have concluded that an alleged tortfeasor who settles with a plaintiff is not, ipso facto, a "self-insurer" under the MSP statute.  We are compelled to draw this conclusion when we apply several well-established canons of statutory interpretation.

First, the term "self-insurance plan" does not exist in a vacuum within the MSP statute.  Rather, it is predicated on the term "primary plan."  As the MSP statute plainly provides, Medicare

---

[16] 42 C.F.R. § 411.50(b).

[17] A prior district court also rejected the government's attempt to rely upon the MSP statute's legislative history, noting then that the "legislative history of the MSP Statute is cryptic and uninformative on the interpretative question now raised." Mason v. American Tobacco Co., 212 F. Supp. 2d 88, 93 (E.D. N.Y. 2002).

is a secondary provider of insurance <u>if</u> <u>and</u> <u>only</u> <u>if</u> a Medicare recipient has another source of medical coverage under a "primary plan." The term "primary plan" is pivotal to the applicability of the MSP statute —— its reimbursement provisions are not triggered unless a Medicare recipient's source of recovery meets the definition of "primary plan," regardless of whether that source is a group healthcare plan, workman's compensation, liability insurance, or a self-insurance plan.

The government asks us to accept its interpretation of "self-insurance plan" without reference to the more fundamental requirement of the MSP statute that this type of insurance plan constitute a "primary plan." To do so would violate the most basic principle of statutory construction: Unless indicated otherwise in a statute, its words are to be given their ordinary meaning, which "cannot be determined in isolation, but must be drawn from the context in which [they are] used."[18] This maxim is particularly apposite here because the MSP statute does not define the term "self-insurance plan"; neither does it define a "primary plan" beyond listing some examples of various types of plans that are deemed primary.

We must, accordingly, look to the ordinary meaning of these terms.[19] A "plan" denotes "a method for achieving an end" or "a

---

[18] <u>United States v. Lyckman</u>, 235 F.3d 234, 238 (5th Cir. 2001).

[19] <u>See</u> <u>INS v. Phinpathya</u>, 464 U.S. 183, 189 (1984) (noting that "in all cases involving statutory construction, our starting point

14

detailed formulation of a program of action."[20] "An insurer is the party to a contract of insurance who assumes the risk and undertakes to indemnify the insured, or pay a certain sum on the happening of a specified contingency."[21] Therefore, in the sense used in the MSP statute, a "primary plan" of "self-insurance" requires an entity's <u>ex</u> <u>ante</u> adoption, for itself, of an arrangement for (1) a source of funds and (2) procedures for disbursing these funds when claims are made against the entity.[22] Recognizing that "[t]he term 'self-insurance' had no precise legal meaning," a leading insurance treatise nonetheless confirms this definition of "self-insurance," noting that

---

must be the language employed by Congress, . . . and we assume that the legislative purpose is expressed by the ordinary meaning of the words used") (quotations and citations omitted); <u>White v. Black</u>, 190 F.3d 366, 368 (5th Cir. 1999) ("The canons of statutory construction dictate that when construing a statute, the court should give words their ordinary meaning and should not render as meaningless the language of the statute.") (citation omitted).

[20] <u>Webster's Ninth New Collegiate Dictionary</u> 898 (Merrian-Webster 1985). Dictionaries are a principal source for ascertaining the ordinary meaning of statutory language, <u>see generally</u> <u>Babbitt v. Sweet Home Chapter of Communities for a Great Oregon</u>, 515 U.S. 687 (1995) (invoking dictionaries by both the majority and the dissent in defining terms in the Endangered Species Act).

[21] 3 COUCH ON INSURANCE 39:1 (3d 2002).

[22] <u>See</u> <u>In re Orthopedic Bone Screw Prods. Liab. Litig.</u>, 202 F.R.D. 154, 166 (E.D. Penn. 2001) (noting that a "'plan' connotes some type of formal arrangement . . . to set aside funds to cover potential future liabilities and a formal procedure for processing claims made against that fund"); <u>In re Diet Drugs</u>, 2001 WL 283163, at *10 (E.D. Penn. 2001) (noting that "the existence of a primary 'plan' connotes some type of formal arrangement").

to meet the conceptual definition of self-insurance, an entity would have to engage in the same sorts of underwriting procedures that insurance companies employ; estimating likely losses during the period, setting up a mechanism for creating sufficient reserves to meet those losses as they occur, and, usually, arranging for commercial insurance for losses in excess of some stated amount.[23]

Thus, according to the ordinary meaning of the terms of the MSP statute, it is wrong for the government to contend that an entity's negotiating of a single settlement with an individual plaintiff is sufficient, in and of itself, for such entity to be deemed as having a "self-insurance plan."

In addition, the regulations promulgated under the MSP statute by the HCFA reflect the ordinary meaning of a "self-insurance plan." The HCFA regulations define a "plan" as "any arrangement, oral or written, by one or more entities, to provide health benefits or medical care or assume legal liability for injury or illness."[24] The regulations further define a "self-insurance plan" as "a plan under which an individual, or a private or governmental entity, carries its own risk instead of taking out insurance with a carrier."[25] It is clear from the regulations implementing the MSP statute that the existence of a self-insurance plan requires that

---

[23] 1 COUCH ON INSURANCE 10:1 (3d 1997). See also Alderson v. Ins. Co. of N. Am., 223 Cal. App. 3d 397, 407 (1990) (noting that "[i]t is implicit in the term, 'self-insurer,' that such person maintains a fund, or a reserve, to cover possible losses, from which it pays out valid claims, and that the self-insurer have a procedure for considering such claims and for managing that reserve").

[24] 42 C.F.R. § 411.21.

[25] 42 C.F.R. § 411.50(b) (emphasis added).

16

there by some form of arrangement —— the creation ex ante of a fund and distribution procedures —— for making potential payments to a set of prospective claimants. The HCFA regulations even speak in prospective terms. For example, § 411.21 defines a "plan" as an "arrangement . . . to provide health benefits or assume legal liability." Such language contemplates a pre-arrangement and makes sense only if a self-insurer creates or maintains a fund or source and establishes rules for making disbursements therefrom in covering the self-insurer's future risk, i.e., when one acts as an insurance carrier for onself.[26]

Furthermore, the well-known interpretative canon, expressio unius est exclusio alterius —— "the expression of one thing implies the exclusion of another"[27] —— confirms that the government is advocating an unreasonably broad interpretation of the MSP statute. The MSP statute explicitly speaks in terms of insurance plans that provide primary medical coverage. Nowhere does the MSP statute mention or even suggest that an alleged tortfeasor who settles a single claim with a single plaintiff falls within the ambit of the statute's category of a self-insurance "plan." The failure of Congress to include in the MSP statute a right of action for reimbursement of medical expenditures against tortfeasors indicates

---

[26] See Silicone Gel Breast Implants,174 F. Supp. 2d at 1254 (noting that "the regulatory language defining 'self-insured plan' connotes some type of formal arrangement by which funds are set aside and accessed to cover future liabilities").

[27] 73 AM. JUR. 2d Statutes § 129 (2002).

17

that this statute "plainly intends to allow recovery only from an insurer."[28]

This application of expressio unius to the MSP statute is further supported by the canon that instructs courts to adopt harmonious interpretations of statutes addressing similar subjects.[29] In this respect, the Medical Care Recovery Act[30] ("MCRA") explicitly provides for the right of action that the government is attempting to read into the MSP statute. The MCRA expressly arms the government with a right to recover medical payments that it has made "under circumstances creating a tort liability upon some third person."[31] In such instances, the government may "institute and prosecute legal proceedings against the third person who is liable for the injury or disease . . . for the payment or reimbursement of medical expenses or lost pay . . . ."[32] In express terms, then, the MCRA affords the government the legal right of recovery that it is urging us to read into the MSP

---

[28] Health Ins. Ass'n v. Shalala, 23 F.3d 412, 427 n.* (D.C. Cir. 1994) (Henderson, J., concurring) (emphasis added).

[29] 73 Am. Jur. 2d Statutes § 168 (2002). We recently recognized that "we should attempt to give horizontal coherence to the United States Code and ensure that different statutes interact coherently and harmoniously." Murphy v. Penn. Higher Educ. Assistance Agency & Educ. Mgmt. Credit Corp., 282 F.3d 868, 872 (5th Cir. 2002) (citing Pierce v. Underwood, 487 U.S. 552, 561-63 (1988)).

[30] 42 U.S.C. § 2651-53 (2002).

[31] § 2651(a).

[32] § 2651(b).

statute, which is silent on the point. The express inclusion of recovery from tortfeasors in the MCRA supports the conclusion that Congress's omission of tortfeasors from the list of those potentially liable under the MSP statute was knowing and intentional.[33]

Recognizing the government's attempt to fold the MCRA into the MSP, the In re Diet Drugs court noted that

> [u]nlike the MCRA, the MSP does not mention a right by the Government to recover from a tortfeasor. Rather, the express wording of the [MSP] statute creates a cause of action only against insurers and their payees. . . . Under the Government's construction of the [MSP] statute, every tortfeasor that used its general assets to fund a tort settlement with persons who had received federal health care benefits would be potentially liable under the MSP. There is simply no support for this extremely broad construction of the [MSP] statute.[34]

When faced with two statutes on similar subjects, courts must, whenever possible, interpret them so as to give effect to both.[35] Yet, if we were to adopt the broad construction of the MSP statute urged by the government in this case, we would, in effect,

---

[33] Cf. In re Dow Corning Corp., 250 B.R. 298, 339 (Bankr. E.D. Mich. 2000) (noting that the court is "dubious that the term 'self-insured plan' covers or was meant to cover every tortfeasor who fails to obtain insurance"); 54 Fed. Reg. 41727 (Oct. 11, 1989) (responding to a comment that explicitly asks for clarification on whether an alleged tortfeasor is liable under the MSP statute as a "self-insurer," the HFCA notes that "the mere absence of insurance purchased from a carrier does not necessarily constitute a 'plan' of self-insurance").

[34] 2001 WL 283163, at *10 (citations omitted).

[35] United States v. Borden, 308 U.S. 188, 198 (1939) ("When there are two acts upon the same subject, the rule is to give effect to both if possible.").

19

eliminate the need for the MCRA, or at least condemn some of Congress's language in the MCRA to the scrap heap of surplusage. This would be unacceptable, particularly when a completely reasonable interpretation of the MSP statute is offered by the plain terms of the statute itself. As a district court noted in rejecting another government attempt to read MCRA authority into the MSP statute: "[I]t is clear that Congress did not intend MSP to be used as an across the board procedural vehicle for suing tortfeasors."[36]

By its plain terms, the MSP statute and the HCFA regulations predicate reimbursement liability on the existence of a primary insurance <u>plan</u>. In its First Amended Complaint, the government obfuscates this fact when it cabins the MSP statute's requirements as applying to those entities that have only "primary payment responsibility."[37] More important, in its specific count against Zimmer, the government <u>never</u> alleges that Zimmer paid Goetzmann and Loftin according to a pre-existing <u>plan</u>; it asserts only the conclusions that Zimmer was "responsible to pay for Defendant

---

[36] <u>Philip Morris, Inc.</u>, 116 F. Supp. at 135. <u>See also</u> <u>Orthopedic Bone Screw</u>, 202 F.R.D. at 165 ("Unlike the MCRA, the MSP does not mention a right by the government to recover from a tortfeasor.").

[37] In its discussion of the HCFA regulations later in the complaint, the government acknowledges that a "third party payer" must possess an "insurance policy, plan . . ., or program that is primary to Medicare" in order to be liable under the MSP statute, citing 42 C.F.R. § 411.21. The government, however, never indicates how this essential legal element for liability under the MSP statute applies to Zimmer in this case.

Loftin's medical expenses" and that Zimmer "was self-insured for its liability to Loftin." As the D.C. district court noted in granting a motion to dismiss by a similarly situated defendant corporation in a parallel case: "In fact, the Complaint does not even allege the existence of any <u>elements</u> of a 'primary plan,' such as a 'plan' or 'arrangement.'"[38]

Even when we liberally construe the government's complaint, as we must, we see that the MSP statute and its implementing regulations require a primary insurance <u>plan</u>. But Zimmer has only negotiated a discrete settlement with a single plaintiff and paid that plaintiff accordingly. It is simply a <u>non</u> <u>sequitur</u> for the government to infer from "payment responsibility" in tort a pre-existing <u>primary</u> <u>plan</u> of self-insurance. In considering the government's allegations against Zimmer under the MSP statute, we are compelled to pose the rhetorical question, where's the plan?[39] Beyond oblique references to Zimmer's responsibility to pay Loftin, the existence of a "primary plan" is nowhere to be found in the government's complaint against Zimmer.

On appeal, the government repeatedly (but in isolation) quotes the MSP statute's phrase that an entity which is "required or

---

[38] United States v. Philip Morris, Inc., 116 F. Supp. 2d 131, 145 (D.D.C. 2000) (original emphasis).

[39] See Orthopedic Bone Screw, 202 F.R.D. at 165-66 (noting that the "Government's argument . . . fails to account for the repeated use of the word 'plan' throughout the MSP and regulations promulgated thereunder").

21

responsible" for paying for a Medicare recipient's healthcare expenses is liable to reimburse the government. Ergo, the government urges, Zimmer is arguably liable under the MSP statute, or at least there is a basis for inferring potential liability sufficient to survive a Rule 12(b)(6) motion to dismiss. Yet, litigants cannot cherry-pick particular phrases out of statutory schemes simply to justify an exceptionally broad —— and favorable —— interpretation of a statute.[40] As the D.C. district court held only one year ago in a similar case litigated by the government under the MSP statute, "MSP liability attaches only to an entity that is 'required or responsible' to pay <u>under a 'primary plan.'</u>"[41] As we already noted, nothing in the government's pleadings can be read to support the conclusional allegation that Zimmer maintained such "primary plan" of self-insurance for paying claimants such as Loftin.[42] According to the plain terms of the MSP statute and the

---

[40] "It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" <u>FDA v. Brown & Williamson Tobacco Corp.</u>, 529 U.S. 120, 133 (2000) (quoting <u>Davis v. Michigan Dept. of Treasury</u>, 489 U.S. 803, 809 (1989)).

[41] <u>United States v. Philip Morris, Inc.</u>, 156 F. Supp. 2d 1, 4 (D.D.C. 2001) (citing 42 U.S.C. § 1395y(b)(2)) (emphasis added).

[42] On appeal, the government submits a copy of a portion of the 10-K filing by Zimmer's parent corporation, Bristol-Myers Squibb Company ("Bristol-Myers"), showing that Bristol-Myers has obtained insurance coverage for a substantial number of <u>breast-implant</u> products-liability claims. Beyond another oblique argument that this 10-K filing reveals that Bristol-Myers has arranged for additional insurance coverage, the government fails to explain how this is relevant to whether Zimmer settled Loftin's discrete <u>hip-prosthesis</u> product-liability lawsuit under a "primary plan" of

22

HCFA regulations, therefore, Zimmer can have no MSP liability.

> 3.  No <u>Chevron</u> Deference for the Government's Interpretation of the MSP Statute.

The government further argues that the term "self-insurance plan," as used in the MSP statute, is ambiguous, entitling the agency's own interpretation to <u>Chevron</u> deference.[43] According to the government, this is particularly relevant because Zimmer is a "large and sophisticated manufacturer of medical devices." As such, Zimmer's status as a "large corporation" permits a reasonable inference that Zimmer "can readily be regarded as self-insured." The government concludes that this is a reasonable interpretation of the MSP statute's ambiguous terms and legislative history, to which we must defer.

We reject this effort by the government to clothe itself in the deference given to agencies' reasonable interpretations of ambiguous statutory provisions. First, the clarity of the MSP statute's terms readily discloses the statute's plain meaning, eschewing the label of ambiguity. Thus, there is no need even to consider <u>Chevron</u> deference because the government's argument fails the first prong of the analysis for granting such deference —— the determination that a statutory grant of authority to a regulatory

---

"self-insurance."

[43] <u>Chevron U.S.A. v. Natural Res. Def. Council</u>, 467 U.S. 837, 843-44 (1984) (holding that courts must defer to an agency's "permissible construction" or "reasonable interpretation" of ambiguous statutory terms).

agency is ambiguous.  As the Chevron court recognized, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[44]

Second, even if the MSP statute were ambiguous and we were to consider legislative history and the agency's regulations, and conclude that the HCFA regulations would support the government's appellate argument that Zimmer's settlement agreement with Loftin constituted a primary self-insurance plan, there is simply no statutory support for the government's position that uninsured "sophisticated corporations" are per se self-insurers.  There is no language in the MSP statute justifying a distinction between a "sophisticated corporation" and an individual or small business. The government does not invite our attention to anything that could serve as a statutory hook on which to hang this argument.  In fact, the government has already attempted to sell this argument to district courts in New York and D.C., but to no avail.[45]  It offers us no reason why we should reject or depart from these previous judicial decisions.  In summary, the government's proffered interpretation of the MSP statute, as it currently stands,

---

[44] Id. at 842-43.  Notably, the Court recognized that the meaning of a statute is ascertained by "employing traditional tools of statutory construction," such as the above-referenced canons. Id. at 843, n.9.

[45] See Mason, 212 F. Supp. 2d at 92; Philip Morris, 156 F. Supp. 2d at 7.

24

constitutes nothing more than "the litigation position of agency counsel that is wholly unsupported by regulations, rulings, or administrative practice [and thus] is not entitled to deference" by this or any court.[46]

C. Goetzmann and Loftin's Reimbursement Liability Under the MSP Statute.

1. Standard of Review.

We review a grant of summary judgment de novo, applying the same standard as the district court.[47] A motion for summary judgment is properly granted only if there is no genuine issue as to any material fact.[48] A fact issue is material if its resolution could affect the outcome of the action.[49] In deciding whether a fact issue has been created, we view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party.[50]

The standard for summary judgment mirrors that for judgment as

---

[46] Silicone Gel Breast Implants, 174 F. Supp. 2d at 1249 (citing Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 211 (1988)). See also Orthopedic Bone Screw, 202 F.R.D. at 164 (denying Chevron deference to the government's interpretation of the MSP statute and regulations).

[47] Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998).

[48] Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[49] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[50] See Olabisiomotosho v. City of Houston, 185 F.3d 521, 525 (5th Cir. 1999).

a matter of law.[51]  Thus, we must review all of the evidence in the record, but make no credibility determinations or weigh any evidence.[52]  In reviewing all the evidence, we must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as the evidence supporting the moving party that is uncontradicted and unimpeached.[53]  The nonmoving party, however, cannot satisfy his summary judgment burden with conclusional allegations, unsubstantiated assertions, or only a scintilla of evidence.[54]

2.    Goetzmann and Loftin are not Required to Reimburse the Government Because They did Not Receive Payment from an Insurer.

The government asserts a right of recovery against Goetzmann and Loftin based on their receipt of monies from Zimmer pursuant to the terms of the settlement agreement.  "Under the MPSA, the United States is limited to pursuing an independent right of recovery against two types of entities: a 'primary plan;' or an entity that has received payment from a primary plan."[55]  As neither Goetzmann

---

[51] Celotex Corp., 477 U.S. at 323.

[52] Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000).

[53] Id. at 151.

[54] Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

[55] Dow Corning Corp., 250 B.R. at 337 (citing cases).  See also Silicone Gel Breast Implants, 174 F. Supp. 2d at 1253 (noting that

26

nor Loftin can be found to have received monies from an entity —— Zimmer —— that distributed funds under a "primary plan," neither Goetzmann nor Loftin can be required to reimburse the government under the MSP statute.

## III. CONCLUSION

This case is the latest illustration of the government's refusal to accept the burgeoning weight of jurisprudence comprising at least seven judicial rejections of its repeated attempts to have the MSP statute construed beyond its plain terms. Six federal district courts and one bankruptcy court have already rejected the government's interpretation of the MSP statute to include alleged tortfeasors who settle with injured plaintiffs.[56] In this case, the government brings nothing new to the table in support of the very same interpretation of the MSP statute that it has repeatedly advanced and had repeatedly rejected by the courts. Rather, the government simply regurgitates yet again the same unavailing arguments.

We appear to be the first appellate court to address this issue, but we see no valid reason to depart from the numerous trial courts' adept analyses of the MSP statute and its implementing

---

"[t]he express wording of the [MSP] statute creates a cause of action against insurers and their payees").

[56] See generally Mason, 212 F. Supp. 2d at 91-93; Silicone Gel Breast Implants, 174 F. Supp. 2d at 1250-59; Philip Morris, 156 F. Supp. 2d at 3-8; Orthopedic Bone Screw, 202 F.R.D. at 163-69; Diet Drugs, 2001 WL 283163, at *9-*12; Philip Morris, 116 F. Supp. 2d at 144-46; Dow Corning Corp., 250 B.R. at 335-42, 348.

regulations. Although we might applaud its motive in seeking to recoup funds it has disbursed for Medicare treatment and services, the government's desire to expand the list of those responsible for reimbursement likely should be directed to Congress rather than to the courts, lest future repetitions be met with sanctions for unnecessarily protracting baseless or even frivolous litigation. As the In re Dow Corning Corp. court noted:

> Despite the relatively simple structure of the MSP [statute], it has generated considerable case law. . . . [S]adly, a significant amount of the legal melee is the direct result of the Government urging statutory constructions, as it has done in this case, that are entirely unsupported by the statute and which appear to be intended to convert the MSP [statute] from an important and sensibly fashioned fiscal cost-cutting measure into a mere, heavy-handed collection tool.[57]

When the instant case is reduced to basics, the government's allegations do not depict Zimmer as having had acted under a primary self-insurance plan when it settled with Loftin. Zimmer was simply an alleged tortfeasor — nothing more and nothing less. Loftin, through her attorney, Goetzmann, was simply a plaintiff in a products-liability lawsuit who, through Goetzmann, agreed to settle with the defendant rather than proceeding to trial. As alleged, the settlement reached between Zimmer and Loftin was a discrete agreement, the result of nothing more than the parties' particular litigation tactics in this one case. In fact, the government does not allege anywhere in its complaint that Zimmer

---

[57] Dow Corning Corp., 250 B.R. at 336 n.21.

paid Goetzmann and Loftin according to a pre-existing _primary_ _plan_ of self-insurance.  The conclusion is thus inescapable:  These three parties are well outside the scope of the MSP statute.  For the foregoing reasons, the district court's dismissals of the government's claims against Zimmer under Rule 12(b)(6), and against Goetzmann and Loftin via summary judgment, are, in all respects, AFFIRMED.